[Cite as *State v. Johnson*, 2015-Ohio-3248.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                          :

    Plaintiff-Appellee,          :

v.                                      :

Michael P. Johnson,                     :

    Defendant-Appellant.         :

No. 13AP-997
(C.P.C. No. 12CR-3961)
No. 13AP-999
(C.P.C. No. 13CR-5503)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on August 13, 2015

*Ron O'Brien*, Prosecuting Attorney, *Laura R. Swisher*, and *Barbara A. Farnbacher*, for appellee.

*Dennis C. Belli*, for appellant.

APPEALS from the Franklin County Court of Common Pleas.

BROWN, P.J.

{¶ 1} In these consolidated appeals, defendant-appellant, Michael P. Johnson, appeals from judgments of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of engaging in a pattern of corrupt activity and multiple counts of aggravated funding of drug trafficking.

{¶ 2} On August 9, 2012, appellant and more than 40 other co-defendants were charged in a 95-count indictment in common pleas case No. 12CR-3961. Under the indictment, appellant was charged with one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32, and 19 counts of aggravated funding of drug trafficking, in violation of R.C. 2925.05. On October 16, 2013, appellant was indicted in common pleas case No. 13CR-5503 on 8 counts of aggravated funding of drug trafficking, in violation of R.C. 2925.05. The two cases were consolidated for trial.

{¶ 3} On August 14, 2012, attorney Javier Armengau entered an appearance on behalf of appellant. On August 24, 2012, plaintiff-appellee, State of Ohio, filed a motion to disqualify counsel on conflict of interest grounds, arguing that Armengau had previously represented a confidential informant utilized by law enforcement personnel during the course of the investigation in the instant actions. On September 20, 2012, appellant filed a memorandum contra the state's motion to disqualify counsel. The parties subsequently submitted affidavits to the trial court under seal regarding the anticipated testimony of the confidential informant (hereafter "the CI"). The trial court, by entry filed November 19, 2012, granted the state's motion to disqualify counsel. Appellant filed an interlocutory appeal with this court from the trial court's entry granting the motion to disqualify. In *State v. Johnson,* 10th Dist. No. 12AP-1067, 2013-Ohio-1682, this court affirmed the trial court's decision.

{¶ 4} The matter came for trial before a jury on October 22, 2013. Columbus Police Detective David M. Allen is a member of the department's tactical division squad, with prior experience investigating pill trafficking rings. Detective Allen testified that such rings typically involve a "three-tiered organization," in which two or three individuals at the top tier act as "organizers" who "fund the money, fund the trips." (Tr. 19.) The organizers supply transportation money, as well as pay for the prescriptions. The detective identified the second tier as comprised of "lieutenants," or persons that the head of an organization "will trust with the money." (Tr. 19-20.) These individuals are also trusted to "collect all the pills once they've been filled at a pharmacy." (Tr. 21.) The final tier of the organization is composed of the individuals who obtain and fill prescriptions, identified by the detective as "abusers"; they tend to be "older," and may have injuries that are somewhat legitimate or "on the fringe." (Tr. 21.)

{¶ 5} Detective Allen identified the most valuable drug on the street as 30 milligram Oxycodone pills. Other valuable drugs include 15 milligram Oxycodone pills and Xanax pills, and all of these medications are "highly addictive." (Tr. 22.) According to the detective, Florida is "the hot bed where most of these pills are coming out of." (Tr. 25.)

{¶ 6} Detective Allen participated in the investigation leading to the arrest of appellant. During the course of that investigation, detectives conducted surveillance of "multiple individuals" they believed were involved in a pill trafficking operation. (Tr. 27.)

The surveillance included monitoring the location of suspects through the use of "[p]ings on cell phones." (Tr. 29.) Among the individuals targeted were Eric MacDonald, Robert Muncy, Richard Muncy, Frances Smith, and Stephanie Kelley. Detectives also conducted surveillance of a business, Creative Tattoos, located on South High Street.

{¶ 7} On December 29, 2011, detectives received information that Kelley, Smith, Richard, and Robert were arriving at Port Columbus International Airport on a flight from Ft. Lauderdale, Florida. Investigators observed the four individuals leave the Columbus airport in a vehicle and travel to Shelly Avenue, stopping at the residence of Smith and Robert. Richard and Kelley then drove to Kelley's residence on Lewis Avenue; later, Richard drove a Plymouth Neon to appellant's residence, located at 1075 Lavender Lane. Detective Allen observed Richard standing with appellant "in the garage." (Tr. 34.) Richard then departed appellant's residence in a different vehicle, a red Ford Taurus, returning to Kelley's residence.

{¶ 8} The next day, these same four individuals drove to Fairfax, Virginia. According to the detective, "they were visiting pharmacies based on the ping chart." (Tr. 36.) Pharmacy records indicated that Richard, Kelley, and Smith filled prescriptions at a Virginia CVS pharmacy on December 30, 2011. Robert and Smith returned to the Fairfax, Virginia area on January 6, 2012. Detectives in Virginia learned that these individuals "visited pharmacies and * * * filled prescriptions that were out of Florida." (Tr. 37.)

{¶ 9} On January 26 and 27, 2012, these four individuals took a round-trip flight from Columbus to Ft. Lauderdale, Florida. Law enforcement officials in Florida followed them to the All Family Medical Center, located in North Ft. Lauderdale. Upon returning to Columbus, they then traveled to Fairfax, Virginia, visiting various pharmacies. At trial, the state introduced copies of prescription records from those pharmacies, including prescriptions for Roxicodone filled in the names of Richard Muncy and Frances Smith.

{¶ 10} During the investigation, detectives obtained statements by Robert Sparks and MacDonald explaining the structure of the organization. Sparks and MacDonald also provided the investigators with names of other individuals. Detective Allen testified that police surveillance and pharmacy records corroborated information provided by Sparks and MacDonald.

{¶ 11} On February 24, 2012, at 11:20 p.m., Columbus Police Detective Brian Key and other law enforcement officers executed a search warrant for appellant's residence on

Lavender Lane. At trial, the state introduced photographs taken of the house at the time of the search. One of the photographs depicted $100 bills, wrapped with a rubber band, found in a drawer located in the master bedroom. Police officers recovered a total of $3,580 cash from the residence, as well as empty pill bottles and bottles containing pills. The officers found a receipt for the purchase of a "multifunction portable sweep." (Tr. 132.) According to Detective Key, the device is used to determine whether a vehicle has "been GPS'd." (Tr. 133.) The officers also located a letter bearing MacDonald's name, and a Budget car rental agreement in the name of Nancy Salyers.

{¶ 12} Detective Key identified other exhibits, including a receipt for a Florida hotel room in the name of Todd Salyers, appellant's nephew, reflecting a cash payment in the amount of $415.39, and bond paperwork for Todd from Manassas Park, Virginia. The officers found labels from pill bottles for Oxycodone in 30 milligram doses in the name of Todd, as well as pharmacy receipts for Todd from Florida pharmacies indicating cash purchases.

{¶ 13} During the search of appellant's residence, officers located business ledgers for Creative Tattoos listing appellant as the owner. At trial, the parties stipulated that appellant and Todd "were directly involved and ran the day-to-day operations of Creative Tattoos on South High Street." (Tr. 159.) The parties further stipulated that Vickie Johnson "was the named owner and was aware of said operations." (Tr. 159-60.)

{¶ 14} Robert, age 37, is married to Smith; Robert has been an acquaintance and friend of appellant since grade school. In 2012, appellant approached Robert about making trips to Florida "to obtain prescriptions." (Tr. 164.) Appellant and Robert reached an agreement for appellant to pay the costs of transportation, hotel, food, physician office calls, and MRIs pertaining to Robert's Florida trips. The purpose of obtaining an MRI, costing approximately $300, was to "receive medication from pain management." (Tr. 165.) On a typical visit, a physician would prescribe for Robert between 160 to 210 Oxycodone 30 milligram pills. Robert also received prescriptions for Oxycodone 15 milligram pills, as well as Xanax and Soma pills. Robert paid cash for the office calls and prescriptions; the cost of each office call was between $300 to $350.

{¶ 15} Robert subsequently obtained Florida identification, allowing for a "[c]heaper office call, easier to fill them in there." (Tr. 169.) Robert would usually travel to Florida with four to six other individuals. MacDonald would "carry the money,"

passing it out to other individuals to cover expenses.  (Tr. 169.)  The cost per person to obtain prescriptions from clinics and physicians in Florida was "[a]pproximately 1,500 to $2,000 round trip."  (Tr. 166.)  After obtaining prescriptions, Robert and the others would check local phone books to find pharmacies in the area, or "doctors would give you lists of pharmacies in the Florida area or the county."  (Tr. 170.)  During the trip back to Columbus, MacDonald gathered all of the Oxycodone "30s," and the other individuals "kept everything else" in return for acquiring the prescriptions.  (Tr. 172.)

{¶ 16} In 2010, the pharmacy price for Oxycodone 30 milligrams was approximately $2 per pill, while the street value was $20 per pill.  In 2012, the pharmacy price of Oxycodone 30 milligrams was between $3 and $4 per pill, while the street value was between $25 and $30 per pill.  Robert and the others eventually looked to other states, including Virginia, to fill the prescriptions at cheaper prices.

{¶ 17} On his first trip to Florida, Robert traveled with his brother, Richard, along with MacDonald and Dalton Chapman, an acquaintance of appellant.  Robert testified that appellant provided the money for that trip, and they traveled in a blue Chevy Suburban driven by Chapman; MacDonald carried the cash for everyone on the trip. After obtaining the prescriptions and returning to Columbus, Robert and the others drove to Creative Tattoos on South High Street.  MacDonald collected the Oxycodone 30 milligram pills from each of the men; Robert was permitted to keep the remaining prescription drugs he had obtained as his payment.

{¶ 18} According to Robert, subsequent trips were financed in the same manner. Robert described one trip in which he arrived at Creative Tattoos prior to leaving for Virginia.  Appellant had a vehicle waiting for Robert at the tattoo shop; underneath the floor mat, Robert found car keys as well as $1,600 in cash, wrapped in a rubber band. Robert and his wife traveled to Virginia, where Robert filled the prescriptions.  Upon returning, Robert parked the vehicle in front of the tattoo shop, leaving the prescriptions underneath the front seat for appellant.

{¶ 19} On three to five occasions, Robert and his brother, Richard, drove to appellant's residence on Lavender Lane to deliver approximately 600 to 800 Oxycodone 30 milligram pills to appellant.  The men would enter appellant's residence through the garage.  Robert also observed other individuals turn Oxycodone pills over to Richard to deliver to appellant.

{¶ 20} Later, Robert and others began taking flights to Florida instead of driving. Upon returning from Florida, Robert would drive to Virginia to fill the prescriptions and then deliver the Oxycodone 30 milligram pills to appellant. Robert sold some of the other prescriptions he obtained from Virginia. Robert testified that he was addicted to pain medication and, on approximately three to five occasions, he purchased Oxycodone 30 milligram pills back from appellant at the tattoo shop.

{¶ 21} On February 24, 2012, law enforcement officers executed a number of search warrants in Franklin County. Robert subsequently signed a proffer letter and spoke with prosecutors and detectives about his knowledge of the organization, entering into an agreement with the state to testify. He later entered a guilty plea to one count of engaging in a pattern of corrupt activity, and eight counts of aggravated trafficking in drugs.

{¶ 22} At trial, the state introduced patient history forms listing the names of patients, their prescribing physicians, the prescriptions obtained, and the particular pharmacy where a prescription was filled. Robert testified as to approximately 12 patient visits he made during trips to Florida from September 2010 to July 2011. Other individuals listed on the patient history forms included MacDonald, Richard, and Terry Maxwell.

{¶ 23} On direct examination, MacDonald admitted to several prior convictions, including for drug trafficking, and he also acknowledged being addicted to prescription drugs. In September 2009, appellant and Chapman contacted MacDonald to ask him if he would be interested in making money traveling to Florida to obtain pills. MacDonald agreed and, over the next two years, he made approximately 80 to 100 trips to Florida, traveling with various other individuals including Richard, Robert, Maxwell, Mark Keller, Kelley, Christine Perry, Benjamin Cline and Christopher Jordan.

{¶ 24} On a typical trip, MacDonald would visit a doctor, "hand over a couple hundred bucks. They give you a paper, tells you where to go to get the MRI. You go get the MRI. You go back to the doctor. You sit and wait. And you see the doctor * * * and they give you the script." (Tr. 259.)

{¶ 25} On MacDonald's first trip to Florida, Chapman paid him $800. MacDonald obtained money for subsequent trips from appellant at appellant's residence. MacDonald would "get with [appellant], and we would figure out who you would take down." (Tr.

262.)  According to McDonald, "[i]t was [appellant's] payment, but I would arrange it." (Tr. 264.)  MacDonald and the others would obtain Oxycodone, Xanax, and Soma pills. The individuals who went on the trips could either receive money or pills as payment, but they were required to turn over the Oxycodone 30 milligram pills.  The amount of money MacDonald received from appellant depended upon the number of individuals making the trip.  Appellant would provide MacDonald with "$2,000 per person."  (Tr. 264.) During these trips, appellant would "call and check * * * and see what's going on, ask me what's going on through the trip."  (Tr. 265.)

{¶ 26} Appellant told MacDonald to provide Sparks "any information that he needed for down there, like doctors, any phone numbers, addresses, * * * anything like that."  (Tr. 266.)  MacDonald also received money from appellant to rent vehicles for the trips to Florida.  Upon returning to Columbus from Florida, MacDonald would phone appellant, "let him know I was back.  So I would have to collect everybody's 30s, which was payment for the money, and drop everyone off and then drop them off to him."  (Tr. 270.)  MacDonald took the pills to appellant's house, meeting appellant in the garage. MacDonald eventually began filling prescriptions in Virginia because it was "a lot cheaper than Florida."  (Tr. 271.)

{¶ 27} MacDonald testified that he took trips to Florida to obtain prescriptions on the following dates: June 7, July 2, August 6, September 2, September 9, September 30, November 9-12, December 8, 2010, January 18-20, February 2, February 18-23, February 24-March 3, March 16-18, March 26-31, April 13-19, April 27-29, May 9-13, June 6-8, June 10, June 30-July 2, July 7-8, August 12, and September 9, 2011. According to MacDonald, appellant gave him money for all of the above trips, and MacDonald delivered pills back to appellant.

{¶ 28} On September 10, 2011, police officers in Virginia arrested MacDonald, as well as Perry, Maxwell, Keller, and Kelley.  The next day, MacDonald attempted to contact appellant for assistance.  MacDonald later entered into a guilty plea to one count of engaging in a pattern of corrupt activity and three counts of attempted aggravated trafficking in drugs.

{¶ 29} During 2009 and 2010, Carter Moore was a frequent visitor to Creative Tattoos.  Carter observed appellant and Eric Sullivan "talk a lot and sometimes switch money" between them.  (Tr. 339.)  Appellant informed Carter that he made money from

other individuals and from prescription drugs. On one occasion, appellant asked Carter if he "wanted to go out of town and make some money." (Tr. 339.) Appellant offered him money for the trip, but Carter declined because he was employed at the time. Carter subsequently entered a guilty plea to one count of aggravated trafficking in drugs.

{¶ 30} Stephen Anderson, age 32, first met appellant in 2010. At that time, appellant "started funding a little activity for me down in Florida." (Tr. 359.) Anderson also began working at a construction company, Nitro Restoration, run by appellant and Sullivan. Anderson took trips to Florida for appellant; on those trips, Anderson would "go down there and get what we had to get and bring it back and give him what was supposed to go to him and keep what was supposed to go to me." (Tr. 360.) Anderson was permitted to keep "all the 15s and all the Xanax and they got all the 30s." (Tr. 361.)

{¶ 31} Appellant and Sullivan were involved in coordinating the trips to Florida during this time. The total cost of a trip for five individuals was between $8,000 to $10,000. On one trip, Sullivan told Anderson that appellant wanted Anderson to teach appellant's nephew how to obtain prescription drugs in Florida. Appellant funded Anderson's trips to Florida through Sullivan, who acted as a middleman. Appellant paid for rental cars for some of the trips to Florida. Upon returning from Florida, Anderson would collect the pills. Anderson "usually kept the Xanaxes" for himself, and he turned over the remainder of the pills to Sullivan and appellant. (Tr. 372.)

{¶ 32} On several occasions, Anderson had conversations with appellant about obtaining money for trips. Anderson spent time in prison from December 2010 until July 2011. Sullivan funded some trips in 2010, but appellant funded all the trips after Anderson's release from prison in 2011. Anderson stopped making trips in 2012 because of police activity. Anderson testified that he made trips funded by appellant "pretty much at least once every month" beginning in August 2010 and ending in January 2012. (Tr. 385.) Anderson subsequently entered a guilty plea to one count of engaging in a pattern of corrupt activity, and five counts of aggravated trafficking in drugs.

{¶ 33} Maxwell has known appellant for 25 years. Appellant "fronted" Maxwell some Oxycodone, 30 milligrams, to resell and "make some money." (Tr. 399.) In spring 2010, appellant approached Maxwell about taking trips to Florida to obtain prescription drugs. Appellant offered Maxwell $500 to make the trip. Appellant informed Maxwell that he would be "going down with another person that I knew who had it all set up as far

as what doctors we were going to.  He had to go down and get a MRI then go from there to * * * see the doctor.  The doctor really didn't care if there was anything wrong."  (Tr. 400.) Appellant further explained to Maxwell that, after the physician wrote the prescription, "[w]e'd go from there to whatever pharmacy was available, normally whichever one was cheapest, and get the prescriptions filled and then head back to Columbus."  (Tr. 403.)

{¶ 34} Maxwell made his first trip to Florida in summer 2010 after he "got behind with some money I owed [appellant]."  (Tr. 400.)  On that trip, Maxwell traveled with MacDonald, Perry, Anderson, and a woman named Kara.  Before departing, they met at Creative Tattoos; they "[w]ent in, got the money" from appellant "[w]rapped in a rubber band."  (Tr. 402.)  Each individual received $2,000, but MacDonald held the money for everyone but Maxwell. On that first trip, Maxwell was unable to obtain drugs because he "tested positive for cocaine."  (Tr. 404.)  Upon returning to Columbus with no pills, appellant told Maxwell he would have to return to Florida and "make it up."  (Tr. 405.)

{¶ 35} Maxwell participated in "[f]our or five" trips to Florida in 2010.  (Tr. 406.) Appellant paid for each of those trips, and Maxwell would go to Creative Tattoos to obtain money prior to leaving.  Upon returning from Florida, Maxwell gave the pills to appellant at the tattoo shop.  Maxwell took trips with MacDonald, Perry, Richard, Cline, Jordan, Keller, Kelley, and Anderson.  On the trips he made with MacDonald, "Eric would hold the majority of the money."  (Tr. 407.)  Maxwell, however, "had a good enough relationship with [appellant] where he trusted me with the money.  But he would hold everybody else's money and regulate what was going on."  (Tr. 407.)  On the return trip from Florida, MacDonald "would gather everybody's pills up * * * around the outskirts of Columbus.  As we're getting close to home he'd get everything together.  Then we'd drop everybody off and meet up with [appellant]."  (Tr. 408.)

{¶ 36} Maxwell later made trips without MacDonald.  On those occasions, Maxwell would "get in touch with [appellant], get the money.  And then I paid another individual to drive me down.  And I would just pay out of money that I received.  I'd pay that fella the gas money, hotel, the food."  (Tr. 407.)  On trips he made without MacDonald, Maxwell would collect the pills from the other individuals "and then I delivered them myself once we got to Columbus."  (Tr. 409.)  Maxwell sometimes delivered pills to appellant's residence and, on other occasions, he accompanied MacDonald to appellant's house to deliver pills.  Maxwell went to appellant's residence "at least 10" times, and to the tattoo

shop "[a]t least five" times to deliver pills.  (Tr. 409.)  When Maxwell handed over the pills, appellant would "count them out; make sure the pill count was right."  (Tr. 410.)  On one occasion, appellant told Maxwell he was sending pills "down to West Virginia to get sold" through "one of his friends," Sullivan.  (Tr. 410.)  Appellant financed trips that Maxwell and others made to Florida on September 9, December 2-3, 2010, February 2, March 1-3, March 29-31, and August 15, 2011.

{¶ 37} Sparks, age 37, met appellant in 2001 and they became friends.  Sparks served five years in prison for a felony conviction for possession of drugs, and he was released on July 28, 2010.  After his release, Sparks began traveling out of state to obtain prescription drugs.  Sparks was involved in obtaining and selling prescription drugs from June 2011 to February 2012.  The CI financed these early trips in which they would obtain Oxycodone 15 and 30 milligram pills.  Sparks also "borrowed money from [appellant], and I did use it to go down [to Florida]."  (Tr. 456.)  Sparks spoke with appellant about making trips to Florida.  Appellant advised Sparks to speak with MacDonald regarding how to obtain drugs in Florida.  MacDonald provided Sparks with detailed information about traveling to Florida to obtain prescriptions.  While in Florida, Sparks sometimes had difficulty obtaining prescriptions; on those occasions, he would contact "several people," including MacDonald and Robert Ruben.  (Tr. 460.)  Sparks once loaned appellant his red Ford Taurus; appellant told Sparks "they did go to Virginia" in the vehicle. (Tr. 464.)    At one point, appellant expressed concern to Sparks about police surveillance.  A friend of Sparks had been "pulled over with some prescription pills as they were leaving the tattoo shop."  (Tr. 463.)

{¶ 38} Sparks purchased prescription pain medication from appellant from June through December 2011.  Sparks recalled purchasing 360 "Percocet" pills from appellant on one occasion, and approximately 100 Percocet pills on another.  (Tr. 465.)  Sparks made one of these purchases at appellant's residence, while he made the other purchase at Creative Tattoos.  Sparks spoke with appellant about taking Smith to Florida for a doctor's appointment, and appellant loaned Sparks $2,500 for the trip.  Smith obtained the pills and turned them over to Sparks, and Sparks then "sold them."  (Tr. 468.)

{¶ 39} Sparks subsequently entered into an agreement with the state to testify in exchange for a recommended eight-year prison sentence.  Sparks further agreed to enter a

guilty plea to one count of engaging in a pattern of corrupt activity, one count of aggravated trafficking in drugs, and one count of aggravated funding of drug trafficking.

{¶ 40} Jason Moore has known appellant for approximately 35 years. MacDonald approached Jason about taking trips to Florida, and Jason made three trips to that state for prescription medications. His first trip was in June 2010, and he traveled with MacDonald, Richard, and Anderson. MacDonald held all the money during that trip. Upon returning from Florida, Jason gave MacDonald all the Oxycodone 30 milligram pills, as well as the "Xanax and Somas." (Tr. 477-78.) After dropping Anderson off at a location on High Street, they drove to Creative Tattoos. According to Jason, this was "the first time that I even knew that [appellant] had anything to do with it. And we walked in. Me, him, Eric and Richie was in the back room. And Eric gave [appellant] the pills. And he returned, gave them money." (Tr. 478.) Appellant gave MacDonald money "rubber band rolled." (Tr. 479.)

{¶ 41} Jason made a second trip in August 2010 with MacDonald, "Eric, Richie, [and] a guy named Ben." (Tr. 479.) MacDonald again held the money during the trip. On one trip, appellant provided a van for transportation. Jason made a third trip to obtain prescription pills in October 2010 with MacDonald, Mike Couch and Moore's fiancée, Patricia Wilson. On the return trip, the vehicle was involved in an accident resulting in Wilson's death. Appellant subsequently drove to Jason's residence and asked Jason to speak with a private investigator. Appellant called the investigator on his phone and handed the phone to Jason. Jason lied to the investigator, telling him "I didn't know what he was talking about." (Tr. 484.)

{¶ 42} Smith, age 39, is married to Robert, and she has known appellant since the eighth grade. In 2009, appellant approached Robert about taking trips to Florida; shortly thereafter, Robert began traveling there to obtain prescription drugs. Robert would return from these trips with "the 180 30s, and like 160 15s, 90 Xanaxes and 90 or 60 somas." (Tr. 502.) In late 2009 and early 2010, Robert was traveling to Florida "[o]nce a month," making trips with Richard and Kelley. (Tr. 502.)

{¶ 43} Beginning in July 2010, Smith went on trips to Florida after "Robert said that we could make more money and get more pills." (Tr. 504.) They initially traveled in Smith's vehicle or Kelley's truck, and appellant provided the money for the trips. Smith traveled once a month, obtaining "160 30s, 120 15s, and 90 Xanaxes and 60 Somas." (Tr.

505.) Richard held the money for the trips. On the return trip to Ohio, Robert and Richard would "take the 30s." (Tr. 505-06.)

{¶ 44} Before leaving on trips, Richard would obtain approximately $2,000 for each individual's expenses. In 2011, Smith and Robert were involved in a "big fight and split up," and Smith began taking trips with Sparks instead. (Tr. 508.) Later, from November 2011 until February 24, 2012, Smith again went on trips with "Robert, Richie and ." (Tr. 509.) During this time, they were making trips once a month. These same individuals subsequently began flying to Florida. Upon returning to Ohio, "we would * * * then go and drive to Virginia and we'd fill the prescription[s] there and drive back." (Tr. 509.) They traveled to Virginia to fill the prescriptions because "[t]hey were cheaper." (Tr. 511.) The Oxycodone 30 milligram pills "would go to [appellant]." (Tr. 512.) Smith acknowledged her own personal use of the prescription drugs; of the pills Smith was able to keep from the trips, she would either take the pills or sell them. Smith paid cash for the prescriptions she obtained. On February 24, 2012, while returning from a trip to Virginia to fill prescriptions, law enforcement officials stopped their vehicle in Virginia.

{¶ 45} Richard testified that his brother, Robert, informed him that appellant wanted him to go to Florida for doctor appointments. Richard had injured his back, and was using prescription pain medication at that time. In 2009, Richard took his first trip to Florida with his brother Robert, along with MacDonald, and Chapman. On that trip, Chapman carried the money for all of the individuals. In return for making the trips, Richard initially received money and some pills, including 15 milligram Oxycodone pills; later, he received just pills. Richard gave the Oxycodone 30 milligram pills to appellant.

{¶ 46} On the initial Florida trips, MacDonald drove and also held the money. In 2010, Richard traveled to Florida approximately once a month. Prior to leaving, MacDonald would obtain the money from appellant. Richard sometimes accompanied MacDonald to pick up money from appellant; it would be "wrapped with a rubber band," with an "individual certain amount for each person." (Tr. 536.)

{¶ 47} Near the end of 2011, MacDonald no longer accompanied him, and Richard began carrying the money himself. Richard would meet appellant at "[e]ither the tattoo shop [or] his home." (Tr. 537-38.) Richard would sometimes meet appellant in the garage of appellant's residence to pick up money or to drop off pills. On other occasions, appellant came to Kelley's residence on Lewis Road, where Richard was staying, to drop

off money.  Sullivan, a friend of appellant, was sometimes present when Richard received money from appellant prior to a trip.

{¶ 48}  Richard testified that physicians scheduled appointments for the individuals "[e]very 28 days."  (Tr. 542.)  Prior to the trips, Richard would speak with appellant about "when we going to meet, get everything straightened around, get the money together and stuff; discuss how many people was going, who was going."  (Tr. 542.)  Richard would drive, and he would pick up the other individuals after obtaining the trip money because appellant "didn't want nobody around."  (Tr. 543.)

{¶ 49} On the early trips, they could obtain 240 of the Oxycodone 30 milligram pills at one time, but later "they started reducing the amount of pills they wanted to give you.  So at the end I believe we was getting like 180 of each."  (Tr. 539.)  Richard and others began traveling to Virginia to fill the prescriptions.

{¶ 50} On most of the trips appellant "was providing the vehicle."  (Tr. 545.) Appellant "bought a couple minivans, was letting us use them."  (Tr. 545.)  Later, Richard borrowed a van from Kelley.  When they flew to Florida, appellant would give Richard a "prepaid debit card and put money on it" to pay for the airline tickets.  (Tr. 546.)  Richard utilized the Internet to purchase the tickets.  After Richard purchased the airline tickets, "we'd wait until ready to go, like the day before, meet with [appellant], get the money for us to go pay for the trips and then we'd go."  (Tr. 547.)  After flying back to Columbus, Richard would "go meet with [appellant], get the rest of the money to go to Virginia to pay for the prescriptions.  I'd go get the money for them to go to Virginia, fill, and then come back." (Tr. 548.)  Richard would also "take all the 30 milligrams from everybody and put them in one bag, and then I'd take them to [appellant]."  (Tr. 549.)  Appellant would "be in the garage waiting on me."  (Tr. 549-50.)  Appellant permitted Richard to use a red Ford Taurus on one of the trips to obtain prescriptions.

{¶ 51} Perry dated MacDonald for 14 years until their relationship ended in September 2011.  MacDonald approached Perry about traveling to Florida to obtain prescription paid medication, including Oxycodone.  Perry made her first trip to Florida in 2011, and then made trips at least "[o]nce a month."  (Tr. 582.)  MacDonald told Perry that he obtained money for the trips from appellant.  Prior to leaving for Florida, MacDonald would go to Creative Tattoos.  Perry once obtained money from appellant to

bail out MacDonald. In September 2011, law enforcement officials in Virginia arrested Perry.

{¶ 52} The CI has known Sparks since 2000, and the CI acknowledged "selling marijuana to him." (Tr. 611.) The CI met appellant in 2010 through Sparks. In summer 2011, the CI observed Sparks leaving on trips to Florida. The CI learned that "the people that rode along with the trips were the actual ones going to the doctor to get the pills and then being compensated for their travel, and the person funding was the individual providing the money." (Tr. 617.) The CI also observed Sparks purchase airline tickets. In July 2011, Sparks asked the CI to dispose of some "[e]mpty and some full pill bottles." (Tr. 620.) Sparks asked him to do this because "I could put them in a dumpster that I would be renting." (Tr. 620.) The CI, acting as a federal informant, provided an IRS agent with information that "Sparks had his people that he was sending, Ruben Rhodes had his group of people, and Mr. Johnson had his group of people, according to Robert." (Tr. 634.)

{¶ 53} Columbus Police Detective Jeremy Ehrenborg testified that he had been involved in "three pill investigations" involving "multiple defendants that were traveling from Columbus, Ohio, to Florida to pick up prescription pills." (Tr. 677.) In each investigation, there was usually one individual who "funded the people who were traveling to get pills." (Tr. 677.) The individuals traveling to obtain the pills "generally didn't have the money to buy the prescriptions or pay for all the travel, the food and stuff like that." (Tr. 678.)

{¶ 54} In November 2011, MacDonald contacted Detective Ehrenborg and told the detective he "had some information that he wanted to provide." (Tr. 690.) Detective Ehrenborg subsequently spoke with MacDonald regarding "his own activity" and "how the organization * * * ran." (Tr. 691.) Law enforcement officials obtained search warrants to activate GPS tracking on cell phones and vehicles, and a GPS unit was placed on Sullivan's GMC Yukon, as well as on a red Ford Taurus owned by Sparks.

{¶ 55} On January 4, 2012, law enforcement personnel observed Leon Taunah at the residence of Sparks. Taunah, who was driving a Dodge Neon, left the residence and drove to Creative Tattoos. A few minutes later, appellant arrived at the tattoo shop. Taunah was observed leaving the tattoo shop and state troopers subsequently stopped his vehicle. A search of the vehicle by troopers revealed receipts from various pharmacies, as

well as prescription pill bottles for Oxycodone 30 milligram pills. In February 2012, law enforcement officials pulled over a vehicle belonging to Smith; the officials searched the vehicle, discovering prescriptions, pharmacy receipts, and a document listing the names and phone numbers of 102 pharmacies.

{¶ 56} Detective Ehrenborg testified that his investigation revealed three organizations or groups headed by Rhodes, Sparks, and appellant. According to the detective, the investigation indicated that "approximately 46,000 Oxycodone 30s" were obtained during the time frame (April 2010 through February 2012) in which individuals were making trips to obtain prescriptions. (Tr. 762.) The detective estimated that the street value of the Oxycodone 30 milligram pills was approximately $920,000.

{¶ 57} Following deliberations, the jury returned verdicts finding appellant guilty of engaging in a pattern of corrupt activity and 18 counts of aggravated funding of drug trafficking in case No. 12CR-3961, as well as 7 counts of aggravated funding of drug trafficking in case No. 13CR-5503. By judgment entry filed November 26, 2013, the trial court sentenced appellant in case No. 12CR-3961 to 7 years of incarceration for the count of engaging in a pattern of corrupt activity, and 3 years of incarceration each as to the 18 counts of aggravated funding of drug trafficking, with all counts to be served consecutive to each other, and to be served consecutive to 3 years incarceration imposed in case No. 13CR-5503.

{¶ 58} On appeal, appellant sets forth the following five assignments of error for this court's review:

> [I.] Defendant-Appellant's convictions for engaging in a pattern of corrupt activity and aggravated funding of drug trafficking are not supported by sufficient evidence to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

> [II.] The State violated Defendant-Appellant's Sixth and Fourteenth Amendment rights to counsel of choice and due process when it misrepresented and concealed material information regarding the expected testimony of its informant in order to manufacture a sham conflict of interest and disqualify Defendant-Appellant's retained attorney.

> [III.] The cumulative effect of the trial court's erroneous evidentiary rulings, restriction on cross-examination, and a defective specific intent instruction deprived Defendant-

Appellant of his Sixth and Fourteenth Amendment right to a fundamentally fair trial and reliable jury verdict.

[IV.] Defendant-Appellant was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

[V.] Defendant-Appellant's consecutive prison sentence totaling 64-years is clearly and convincingly contrary to law and/or an abuse of discretion.

{¶ 59} Under the first assignment of error, appellant contends that his convictions for engaging in a pattern of corrupt activity and aggravated funding of drug trafficking are not supported by sufficient evidence. More specifically, appellant argues that the state failed to prove: (a) the identity of the controlled substance, (b) that he funded another's drug business, (c) the element of specific intent, and (d) that he engaged in a pattern of corrupt activity.

{¶ 60} In reviewing "a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 61} The offense of engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1) is defined as follows: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." An "enterprise" is defined to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). An enterprise "includes illicit as well as licit enterprises." R.C. 2923.31(C). Pursuant to R.C. 2923.31(E), " '[p]attern of corrupt activity' means two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶ 62} Under R.C. 2923.31(I), "[c]orrupt activity" is defined to mean:

> * * * [E]ngaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:
>
> * * *
>
> (2) Conduct constituting any of the following:
>
> * * *
>
> (c) Any violation of section * * * 2925.03, * * * 2925.05, * * * of the Revised Code, any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree and that occurs on or after July 1, 1996, * * * when the proceeds of the violation, * * * or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars, or any combination of violations * * * when the total proceeds of the combination of violations * * * or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars[.]

{¶ 63} The offense of aggravated funding of drug trafficking is set forth under R.C. 2925.05, which states in part:

> (A) No person shall knowingly provide money or other items of value to another person with the purpose that the recipient of the money or items of value use them to obtain any controlled substance * * * for the purpose of selling or offering to sell the controlled substance in the following amount:
>
> (1) If the drug to be sold or offered for sale is any compound, mixture, preparation, or substance included in schedule I or II, * * * an amount of the drug that equals or exceeds the bulk amount of the drug[.]

{¶ 64} Appellant first argues the state failed to prove the identity of the controlled substance. Specifically, appellant contends the state failed to lay a foundation or elicit lay testimony from the co-defendants regarding the identity of the pills allegedly turned over to him. According to appellant, the state's witnesses implicitly relied on the labeling of the prescription bottles when they testified the pills were Oxycodone; appellant maintains such evidence is insufficient to establish the identity of the contents of the pill bottle.

{¶ 65} Under Ohio law, "the experience and knowledge of a drug user lay witness can establish his or her competence to express an opinion on the identity of a controlled substance if a foundation for this testimony is first established." *State v. McKee,* 91 Ohio St.3d 292, 297 (2001). Such evidence "meets the requirements of Evid.R. 701. It is testimony rationally based on a person's perceptions and helpful to a clear understanding of a fact in issue." *Id.* In order for drug identification testimony to be admissible under *McKee*, "the state need only establish the competence of the proposed lay witness." *State v. Gonzales,* 6th Dist. No. WD-13-086, 2015-Ohio-461, ¶ 23. Such competence "is established in this context by 'providing the court with a foundation that demonstrates that the lay witness has a sufficient amount of experience and knowledge either from having dealt with or having used the same type of controlled substance in the past that he or she is now being asked to identify.' " *Id.*, quoting *State v. Maag*, 3d Dist. No. 5-03-32, 2005-Ohio-3761, ¶ 37.

{¶ 66} In the instant case, various witnesses for the state testified as to their addiction to, and extensive use of, prescription pain medications including Oxycodone. Robert stated he was addicted to the prescription drugs, and that "[i]t was a habit" for him. (Tr. 189.) MacDonald related that he usually "chose pills" instead of taking cash for the trips he took "because [of] my addiction." (Tr. 267.) With the pills he received, MacDonald "sold some to pay bills. But the majority of them I kept to eat them." (Tr. 267.) Anderson testified that he "was using the pills pretty good." (Tr. 410.) Smith would either sell or use the pills she kept from her trips. Richard acknowledged being "addicted" to these prescription medications following a back injury. (Tr. 532.) During his first trips he would receive some money, but "it got to where I got no money given to me. * * * I got to keep all the 15 milligrams [Oxycodone] and Somas and Xanax." (Tr. 534.)

{¶ 67} Ohio courts have accepted similar lay witness testimony to establish the identity of a suspected substance. *See, e.g., State v. Johnson,* 4th Dist. No. 13CA16, 2014-Ohio-4032, ¶ 42 (law officer's reliance on appellant's testimony that she recognized Hydrocodone because of her previous prescription established a foundation for the officer to rely on appellant's identification of drug); *State v. Mielke,* 12th Dist. No. CA2012-08-079, 2013-Ohio-1612, ¶ 42 (testimony by lay witness that he had been a past steroid user and distributor sufficient to establish controlled substances element of the offense of trafficking in drugs); *State v. Singleton,* 11th Dist. No. 2002-L-077, 2004-Ohio-1517, ¶ 23

(testimony of lay witnesses, including minors, that they had past experience using marijuana and cocaine sufficient to establish substances defendant provided to children were in fact marijuana and cocaine).

{¶ 68} Under Ohio law, the state can establish the identity of a controlled substance through either direct or circumstantial evidence. *See State v. Bowling*, 12th Dist. No. CA2013-08-159, 2014-Ohio-1690, ¶ 15 ("The government only needs to produce sufficient evidence, direct or circumstantial, from which the trier of fact is able to identify the substance beyond a reasonable doubt.").

{¶ 69} Upon review of the testimony at issue, we find that the state presented a sufficient foundation (i.e., that the co-defendants were familiar with the controlled substances at issue based upon their personal knowledge and prior experience using such drugs) such that these witnesses were qualified to testify with respect to the identity of the drugs. In addition to the lay testimony presented, the state also introduced prescription records, prescription receipts, as well as Oxycodone pills recovered during several police searches. Here, the subject testimony, as well as other circumstantial evidence presented, was sufficient to establish the identity of the substances beyond a reasonable doubt.

{¶ 70} Appellant also contends the state failed to prove that he funded "another" person's trafficking. Appellant argues the state did not prosecute him on a theory he was passively financing the drug trafficking business of a third party but, rather, that he was recruiting drug addicts to obtain Oxycodone to market on his own.

{¶ 71} The state responds that appellant's argument adds an additional element not contained in the statute, i.e., that the recipient of the money both obtain the controlled substances and sell or offer to sell them. The state argues there is no such requirement under R.C. 2925.05; instead, the state maintains, the statute only requires that the recipient of the money use it to obtain the controlled substance for purposes of future resale. We agree. *See, e.g., State v. Turner,* 6th Dist. No. E-95-056 (Aug. 29, 1997) (evidence sufficient to support conviction for funding where defendant "expressed disappointment that he would not be able to make money reselling the cocaine after it was clear that the sale would not take place"); *State v. Caudill,* 3d Dist. No. 05-97-35 (Dec. 2, 1998) (evidence sufficient to convict defendant of funding where defendant provided

money to others used to obtain drugs in Texas that were subsequently delivered to defendant for distribution in Ohio).[1]

{¶ 72} Appellant next asserts the state failed to prove he had specific intent to sell or offer to sell more than the bulk amount of the drugs. Appellant cites the lead detective's admission that he made no attempt to arrange an undercover purchase from appellant. Appellant further contends that the testimony of the co-defendants on this element was sketchy and uncertain.

{¶ 73} In response, the state maintains there was direct evidence, based upon the testimony of other co-defendants, including Robert and Sparks, that these individuals purchased pills from appellant on multiple occasions. The state further points to evidence regarding the substantial quantity of Oxycodone pills obtained by multiple travelers every 28 days which, the state maintains, on each trip greatly exceeded the bulk amount; according to the state, the sheer number of pills procured evinces ample circumstantial evidence of intent to sell or resell.

{¶ 74} To the extent appellant challenges the credibility of the co-defendants, i.e., that their testimony was "sketchy," a reviewing court will not weigh the evidence in considering a sufficiency challenge. *See, e.g., State v. Green,* 117 Ohio App.3d 644, 650 (1st Dist.1996) ("In reviewing a legal-sufficiency argument, a reviewing court cannot resolve evidentiary conflicts in favor of appellant or substitute its evaluation of witness credibility for the jury's.").

{¶ 75} At trial, numerous co-defendants provided testimony that appellant paid them to travel to physician clinics in Florida to obtain pain prescriptions, including Oxycodone 30 milligram pills, and to then fill the prescriptions at various pharmacies. Upon returning to Ohio, the individuals tasked with leading the groups on the trips would collect and deliver the 30 milligram Oxycodone pills to appellant. The co-defendants also provided testimony as to the quantity of Oxycodone 30 milligram pills they procured on the trips, including Robert, who stated that he usually travelled to Florida with four to six

---

[1] Notwithstanding appellant's interpretation of the funding statute, we note the state presented evidence that various co-defendants who traveled to Florida sold drugs they obtained, including Maxwell, who testified that appellant "fronted me some perc 30s * * * [t]o resell, make some money." (Tr. 399.) Maxwell also testified that appellant sent pills to West Virginia for Sullivan to sell. Smith testified that, after turning over the Oxycodone 30 milligram pills, she would either keep the remaining pills for her own use or "sell them." (Tr. 512.) Perry testified that MacDonald would "get his medicine and then * * * sell them." (Tr. 586.) MacDonald acknowledged selling pills "to pay bills." (Tr. 267.)

individuals, and that on these trips each individual typically received prescriptions for either 160 or 210 Oxycodone 30 milligram pills, as well as 160 Oxycodone 15 milligram pills, 90 Xanax pills and 90 Soma pills.  Robert testified as to approximately 12 trips he made to obtain Oxycodone and other medications.  Robert related that he and his brother, Richard, went to appellant's residence to deliver between 600 to 800 Oxycodone 30 milligram pills.  Robert also purchased Oxycodone 30 milligram pills from appellant on different occasions.

{¶ 76} MacDonald testified that he traveled with other individuals to Florida almost weekly; during these trips each individual obtained either 180 or 240 Oxycodone 30 milligram pills.   According to MacDonald, he made approximately 80 of these trips over an almost two-year period.  Maxwell testified that he made 4 or 5 trips to Florida in 2010, and that appellant financed each of those trips.  Smith made trips to Florida on a monthly basis; on these trips, she would procure 160 Oxycodone 30 milligram pills, as well as other pain medications including Xanax and Soma pills.  Sparks testified that he purchased pills from appellant, including purchases of 360 Percocet pills on one occasion, and 100 Percocet pills on another.  At trial, the parties stipulated that the bulk amount of Oxycodone 30 milligram pills, a Schedule II substance, is 15 unit doses or 15 pills.

{¶ 77} Here, viewing the evidence most strongly in favor of the prosecution, as we are required to do in considering a sufficiency argument, we find that the state presented sufficient evidence for the jury to find that appellant obtained the controlled substances for the purpose of selling or offering to sell more than the bulk amount of the drugs.  The record supports the state's contention that there was direct evidence that appellant sold pills on multiple occasions.  Additionally, the state presented testimony, cited above, as to the quantity of drugs obtained by co-defendants during the nearly two-year period.  The state also introduced exhibits including a chart listing the prescriptions for Oxycodone 30 milligram pills obtained by the various individuals, as well as individual pharmacy patient history records.

{¶ 78} According to Detective Ehrenborg, over the time period from April 2010 to February 2012, the investigation revealed that the individuals traveling to Florida obtained approximately 46,000 Oxycodone 30 milligram pills, and that the street value of the drugs obtained was $920,000.  Further, the state presented other circumstantial evidence, including items recovered from appellant's residence, evincing an intent by

appellant to sell or resell. *See, e.g., State v. Pippen,* 4th Dist. No. 11CA3412, 2012-Ohio-4692, ¶ 36 (given sheer quantity of Oxycodone recovered, as well as other evidence including cash recovered from home, it was reasonable for jury to find defendant intended to sell or resell the Oxycodone). Accordingly, a rational trier of fact could have found the elements of aggravated funding of drug trafficking proven beyond a reasonable doubt.

{¶ 79} Appellant's challenge regarding his conviction for engaging in a pattern of corrupt activity is predicated upon his claim that the evidence was insufficient to support his convictions for aggravated funding of drug trafficking. As indicated above, however, the evidence was sufficient to support those convictions, and we further find that appellant's conviction for engaging in a pattern of corrupt activity was supported by sufficient evidence.

{¶ 80} Based upon the foregoing, appellant's first assignment of error is overruled.

{¶ 81} Under his second assignment of error, appellant contends the state violated his right to counsel of choice in moving to disqualify attorney Javier Armengau prior to trial. Appellant argues that the state misrepresented and concealed material information regarding the expected testimony of the CI in order to manufacture a sham conflict of interest and thereby disqualify Armengau from representing him.

{¶ 82} As noted under the facts, on August 24, 2012, approximately one year prior to trial, the state filed a motion to disqualify counsel on the basis of an alleged conflict of interest, i.e., that attorney Armengau was currently representing an informant utilized by law enforcement investigators in the instant case. In its motion, the state represented that it intended to call the CI as a witness at trial. On October 3, 2012, the trial court conducted a hearing on the motion to disqualify, during which the prosecutor noted that attorney Armengau had negotiated a plea agreement in federal court on behalf of the CI; the prosecutor expressed his view that the CI had an ongoing obligation to testify in the current case. The state further represented that it intended to call the CI as a witness, and noted that Armengau might be required to advise the CI "whether * * * or not testifying would break the defendant's agreement," as well as "whether to take the Fifth or not." (Oct. 3, 2012 Tr. 4.) The prosecutor also argued that the CI had spoken with another potential witness, Sparks, and that Sparks had requested that the CI "call Mr. Armengau to ask legal advice as to whether or not to take the deal offered." (Oct. 3, 2012 Tr. 5.)

{¶ 83} Attorney Armengau stated during the hearing that "[t]he confidential informant, who I did work out a plea agreement for in federal court, has never in federal court or anywhere else given any information on [appellant]. * * * He's never had any dealings with [appellant] in any capacity." (Oct. 3, 2012 Tr. 7.) At the close of the hearing, the trial court expressed concern that the CI is "going to be called, and that [the CI] does have information that can be used against * * * [appellant]." (Oct. 3, 2012 Tr. 14.) The court therefore requested the prosecution to submit an affidavit regarding the CI's knowledge of appellant's activities.

{¶ 84} On October 23, 2012, the state filed under seal the affidavit of the CI. In response, attorney Armengau filed his own affidavit. By decision and entry filed November 19, 2012, the trial court granted the state's motion to disqualify counsel. In its decision, the court cited concern regarding the CI's "obligation to testify in this case pursuant to the defendant's agreement that was negotiated as part of his plea in federal court," and the fact that attorney Armengau, "who negotiated the deal, may have to give the CI advice as to his obligation pursuant to the defendant's agreement." The court acknowledged it "will not know the full potential extent of the conflict until the CI testifies," but noted, "[a]t that time * * * it will be too late to remedy the problem short of a mistrial if, as he alleges in his affidavit, the CI has admissible adverse evidence against the defendant." The court also indicated it was "satisfied that the State has not manufactured a conflict." As indicated under the facts, after the trial court rendered its decision granting the state's motion to disqualify counsel, appellant filed an interlocutory appeal. In *Johnson*, this court affirmed the decision of the trial court granting the state's motion to disqualify.

{¶ 85} Appellant argues the prosecution submitted a misleading affidavit to the trial court, leaving the court with the impression the CI possessed a substantial body of first-hand knowledge implicating him. Appellant maintains that later developments at trial confirmed the state had fabricated an alleged conflict of interest. According to appellant, the CI's trial testimony indicates the CI's sole knowledge came from information received by co-defendant Sparks. Appellant further argues that the prosecution had a duty to inform the trial court that this "tiny snippet of testimony" was the entirety of the information the CI could provide against him.

{¶ 86} In general, "[t]he Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence.'" *Wheat v. United States*, 486 U.S. 153, 158 (1988). Accordingly, "[a] criminal defendant who desires and is financially able to retain his own counsel 'should be afforded a fair opportunity to secure counsel of his own choice.' " *Serra v. Michigan Dept. of Corrections,* 4 F.3d 1348*,* 1351 (6th Cir.1993), quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932). Although a criminal defendant "who can afford his own attorney has a right to his chosen attorney, that right is a qualified right." *Id.* at 1351 citing *Wheat* at 159. As such, a "trial court 'must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.' " *Id.*, quoting *Wheat* at 164.

{¶ 87} In *Wheat,* the United States Supreme Court recognized circumstances in which "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Id.* at 163. The United States Supreme Court further noted, however, that "trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision." *Id.*

{¶ 88} At the outset, we find unpersuasive appellant's contention that the CI had no first-hand information to offer, and that the CI's sole source of information was from Sparks.[2] In his affidavit, the CI related information appellant had provided him, as well as information regarding discussions he had with attorney Armengau. At trial, the CI testified that he had sold marijuana to Sparks, and that he met appellant in 2010 through Sparks. The CI stated he had "a pretty good relationship" with appellant, and that they "went in together on a car lot." (Tr. 612.) The CI became an informant for the federal government following his conviction for conspiracy to distribute marijuana. In summer 2011, the CI witnessed Sparks leaving for trips to Florida, and he also observed Sparks

---

[2] We also find unpersuasive appellant's claim that Sparks did not participate in the conspiracy. At trial, the state presented evidence that: (1) Sparks and MacDonald cooperated with the state in identifying the enterprise; (2) Sparks' vehicle, which he loaned to appellant, was used to obtain prescriptions; (3) appellant loaned Sparks money to travel to Florida to obtain prescriptions; (4) appellant advised Sparks to speak with MacDonald about obtaining drugs in Florida; (5) Sparks contacted MacDonald for assistance while in Florida; (6) Sparks bought drugs from appellant; and (7) appellant warned Sparks about police surveillance.

talking with other individuals about taking trips to Florida. According to the CI's understanding, "the people that rode along with the trips were the actual ones going to the doctor to get the pills and then being compensated for their travel, and the person funding was the individual providing the money." (Tr. 617.) The CI testified that Sparks would either drive his own vehicle or he would sometimes rent vehicles for the Florida trips. The CI observed Sparks leave for trips with various individuals, and also observed Sparks buy airline tickets for some of the trips.

{¶ 89} In July 2011, Sparks asked the CI to dispose of some "[e]mpty and some full pill bottles." (Tr. 620.) Sparks asked the CI to dispose of them because the CI had access to a "dumpster that I would be renting." (Tr. 620.) Sparks also provided the CI with some prescription receipts. The CI gave the pill bottles and receipts to a federal agent. At trial, the state introduced as exhibits a receipt bearing the name of Malik Willoughby, who the CI testified was one of the individuals taking trips to Florida with Sparks, and pill bottles listing Willoughby's name as well as the names of Carter and Dustin Childers. The CI identified other exhibits, including a Florida driver's license for Sparks, prescription receipts bearing Sparks' name, identification for Carter, a pharmacy receipt in the name of Ronald Barrowman, and empty pill bottles bearing the names of Barrowman and Willoughby. The CI testified that he had provided all of the above items to the federal agent. Sparks also spoke with the CI about the trips, including information as to who was funding the trips. The CI informed the federal agent that "Sparks had his people that he was sending, Ruben Rhodes had his group of people, and [appellant] had his group of people, according to Robert." (Tr. 634.)

{¶ 90} As noted, following the hearing on the motion to disqualify, the trial court granted the state's motion on the basis that attorney Armengau's representation of the CI, who the state intended to call as a witness in appellant's trial, created a serious potential for conflict. In this court's decision affirming the trial court's granting of the state's motion to disqualify, we found merit with the trial court's analysis. Specifically, this court noted that, in the event "the CI is placed on the witness stand and testifies while Armengau represents Johnson, an un-resolvable conflict exists. Armengau cannot damage his former client's credibility through use of privileged information. At the same time, Armengau must diligently represent Johnson's interests by damaging the CI's credibility." *Johnson* at ¶ 5. This court further noted that "ethical problems have already

arisen in this case" based upon Armengau's admission that "he has already had a meeting with the CI since Armengau was retained by [appellant]." *Id.* at ¶ 6.

{¶ 91} Here, at the time of the motion, the state cited a valid concern regarding a clear potential for conflict. Courts have recognized the "obvious" potential for conflict where defense counsel "is under a duty to represent zealously the defendant, while on the other hand, he has a duty of confidentiality to his former client, the government witness." *United States v. Falzone,* 766 F. Supp. 1265, 1271 (W.D.N.Y.1991). In this respect, "numerous cases have recognized" that an attorney's duty of loyalty to a client "requires disqualification when a former client seeks to cooperate with the government and testify against the present client." *United States v. Alvarez,* S.D.Fla. No. 10-20547-CR (Nov. 16, 2010). The potential for conflict arises especially in the context of cross-examination, as defense counsel's "most important function" during a criminal trial is to "vigorously cross-examine the government's witness." *Falzone* at 1271. *See also United States v. Moscony,* 927 F.2d 742, 750 (3d Cir.1991) ("Conflicts of interest arise whenever an attorney's loyalties are divided * * * and an attorney who cross-examines former clients inherently encounters divided loyalties."). Further, "there need not be a 'substantial relationship' between the subject matter of the prior representation and the issues in the present case before disqualification is warranted." *Falzone* at 1275. Rather, "[a]ll that is required is that the interest of the defendant potentially conflicts with the interest of the former client." *Id.*

{¶ 92} Upon review, the record does not demonstrate bad faith on the part of the state in bringing the potential conflict to the attention of the trial court. While appellant challenges the affidavit of the CI in support of the motion to disqualify, there is nothing in the record to suggest the state misrepresented what the CI indicated he knew at that time, or that the state brought the motion as a strategy to deprive appellant of Armengau's representation. As noted, the state represented at the hearing on the motion that it intended to call the CI as a witness, and the CI ultimately did testify. As also discussed, the record does not support appellant's contention that the only information the CI possessed was through conversations with Sparks. Rather, the CI testified not only to information Sparks provided, but also his "personal observation[s]" and conduct. (Tr. 630.) Here, notwithstanding the benefit of hindsight in the form of the CI's trial

testimony, appellant has not demonstrated that the state acted improperly in filing the motion to disqualify counsel by attempting to manufacture a conflict of interest.

{¶ 93} Accordingly, the second assignment of error is not well-taken and is overruled.

{¶ 94} Under the third assignment of error, appellant argues the trial court deprived him of a fair trial due to the cumulative effect of erroneous evidentiary rulings, restrictions on cross-examination, and a defective specific intent instruction. Appellant first argues the trial court erred in permitting the state to elicit testimony from Detective Allen regarding the organization and operation of pill trafficking rings. Appellant contends the detective's testimony added nothing to the jury's comprehension of the primary facts, and that such testimony was only offered to bolster the testimony of the co-defendant witnesses.

{¶ 95} At trial, defense counsel objected to the state's questioning of Detective Allen as to the organization and structure of pill trafficking rings in general. Counsel argued that "[w]hat is typical or usual is irrelevant as to what the facts of this case are." (Tr. 20.) The trial court overruled this objection, stating in part: "The fact that this witness * * * is testifying as to what might be normal is not evidence against [appellant]. It may or may not become relevant in descriptive manner later on." (Tr. 20.)

{¶ 96} Under Ohio law, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage,* 31 Ohio St.3d 173 (1987), paragraph two of the syllabus.

{¶ 97} As noted, appellant contends the testimony of the detective bolstered the credibility of the co-defendants. Appellant relies upon a federal decision, *United States v. Cruz,* 981 F.2d 659, 663 (2d Cir.1992), in which that court held "the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct." We note that in *Cruz,* the "Second Circuit was especially troubled * * * by the government's heavy reliance, during summation, on expert testimony to support the credibility of its fact-witness[] and to show that the defendant[] acted in conformance with other guilty persons." *United States v. Saulter,* 60 F.3d 270, 277-78 (7th Cir.1995). Federal courts, however, have distinguished *Cruz* in cases where a law enforcement officer testifies

"about a process not readily understandable by the average juror and the government did not use the testimony solely to corroborate" the testimony of a fact-witness. *Id.* at 278.

{¶ 98} A review of the challenged testimony in the instant case indicates the detective's comments were limited to basic background information regarding hierarchy/structure of pill trafficking organizations, and the trial court could have reasonably concluded that such testimony was useful to the jury. *See, e.g., State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 112 (trial court did not err in allowing detective to give expert testimony on gang-related activities that "provided the jury with crucial background information in considering the evidence").

{¶ 99} Federal courts have similarly recognized that testimony concerning drug trafficking operations can be relevant to a jury's understanding. *United States v. Dalton,* 574 Fed.Appx. 639, 643 (6th Cir.2014) ("It was not an abuse of discretion for the district court to conclude that the details of oxycodone trafficking—particularly the details concerning the necessity and development of sponsorship in pill-trafficking organizations—are not within the ambit of lay knowledge."); *United States v. Smith,* 601 F.3d 530, 540 (6th Cir.2010) ("Because the structure of a drug conspiracy is not within the knowledge of an average juror, the admission of [investigator's] testimony into evidence was not reversible error."). Here, the record does not indicate that the detective's testimony was relied upon solely to bolster the credibility of the co-defendants' testimony, and we find no abuse of discretion by the trial court in allowing the detective to testify about the general hierarchy/structure of pill trafficking operations.

{¶ 100} Appellant next asserts the trial court unreasonably restricted defense counsel's cross-examination of Detective Allen regarding items sought under the search warrant issued for appellant's residence. Appellant argues that defense counsel attempted to cross-examine the detective regarding items of contraband, criminal tools, and ledgers sought under the express terms of the search warrant for appellant's residence. According to appellant, defense counsel intended to establish that the search was wholly unsuccessful insofar as it failed to corroborate proffer information used to obtain the search warrant.

{¶ 101} In general, "[t]rial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation."

*State v. Edwards,* 8th Dist. No. 87587, 2006-Ohio-5726, ¶ 17, citing *Mueller v. Lindes*, 8th Dist. No. 80522, 2002-Ohio-5465; *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). Further, "[t]he limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case," and "[s]uch exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre,* 6 Ohio St.3d 140, 145 (1983).

{¶ 102} In the instant case, while the record indicates the trial court sustained the state's objection with respect to defense counsel's "reading from the warrant," the court noted it would allow defense counsel to inquire of the detective whether he found "any ledgers, did you find any of that." (Tr. 89.) Thus, the court indicated it would permit counsel to "[a]sk those questions. Just not bootstrapping to the warrant." (Tr. 90.) We find no error with the court's ruling. As noted by the state, detailed information about the contents of the proffers by the various co-defendants was not part of the record, and the witness at issue, Detective Allen, was not present during the search of appellant's residence. Upon review, we find the trial court did not abuse its discretion in its limitation of the scope of cross-examination of the detective.

{¶ 103} Appellant next contends the trial court erred by admitting into evidence certain co-conspirator statements under Evid.R. 801(D)(2), the co-conspirator exception to the hearsay rule. According to appellant, the state failed to lay a sufficient foundation to show that the hearsay statements were made during the course of or in furtherance of the drug conspiracy.

{¶ 104} Pursuant to Evid.R. 801(D)(2)(e), "a statement is not hearsay if it was made by a co-conspirator during and in furtherance of the conspiracy." *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 102. Such "[s]tatements of co-conspirators are not admissible under Evid.R. 801(D)(2)(e) * * * until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." *Id.*, citing *State v. Carter,* 72 Ohio St.3d 545 (1995), paragraph three of the syllabus. Under Ohio law, "[t]here is no requirement that the defendant be charged with the crime of conspiracy in order to introduce out-of-court statements by co-conspirators under Evid.R. 801(D)(2)(e)." *State v. Eacholes,* 12th Dist. No. CA2013-11-195, 2014-Ohio-3993, ¶ 19. Further, "[i]ndependent proof of conspiracy merely requires that the State present

evidence sufficient to raise the inference of conspiracy." *State v. Croom,* 2d Dist. No. 25094, 2013-Ohio-3377, ¶ 66.

{¶ 105} The state argues it made a prima facie showing of the existence of the conspiracy by independent proof prior to the admission of the challenged statements. Specifically, the state points to the testimony of three witnesses, Detectives Allen and Key, and Robert, as providing independent proof of the conspiracy.

{¶ 106} At trial, Detective Allen testified that he was the case manager for the investigation targeting the activity of appellant and other co-defendants, and he described surveillance conducted by law enforcement personnel of various individuals, including appellant, Robert, Richard, MacDonald, Kelley and Smith. Detective Allen listed various locations that were under surveillance, including a tattoo shop and appellant's residence, and he noted that officers monitored Richard's cell phone. The investigation revealed that Robert, Richard, Kelley, and Smith had traveled to Florida to obtain prescription drugs, and that they subsequently traveled to Virginia to fill prescriptions. Detective Allen identified prescription drug records obtained from a number of pharmacies reflecting prescriptions filled in the names of various co-defendants, including prescriptions for Oxycodone 30 milligram pills. Investigators observed Richard at appellant's residence and tattoo business following trips taken by these co-defendants. Detective Allen noted that two individuals, Sparks and MacDonald, had proffered information to the state regarding the "main defendant," as well as other suspects, and had also provided information as to the structure of the organization. (Tr. 46.) According to the detective, police surveillance and a review of pharmacy prescription records verified the information provided by MacDonald and Sparks.

{¶ 107} Detective Key identified items recovered from appellant's residence following the execution of a search warrant. Those items included $3,580 in cash, a receipt for a portable sweep, pill bottles, a Florida hotel receipt in the name of appellant's nephew, Todd, bond paperwork and prescription receipts for Todd, a letter bearing MacDonald's name, and a car rental agreement in the name of Nancy.

{¶ 108} Robert testified that appellant approached him in 2010 about an "agreement * * * to go to Florida, obtain prescriptions." (Tr. 164.) Under the terms, Robert would "give up the" 30 milligram Oxycodone pills to appellant, and "keep everything else." (Tr. 164.) According to Robert, appellant provided the funding to pay

for physician office visits, MRIs, hotel rooms and other travel expenses. Robert would obtain prescriptions for between 160 and 210 Oxycodone 30 milligram pills each visit. Robert would usually make the trip with between four to six other individuals, and each of these individuals would also obtain prescriptions.

{¶ 109} Upon review, we find that the state introduced sufficient evidence showing independent proof to raise the inference of a conspiracy, and appellant's participation therein, prior to the admission of the challenged statements. We, therefore, find no error by the trial court in ruling the statements at issue were admissible as non-hearsay statements of a co-conspirator under Evid.R. 801(D)(2)(e).

{¶ 110} Appellant further contends the trial court gave an erroneous specific intent instruction, arguing that the pattern instruction in the Ohio Jury Instructions for the offense of funding of drug trafficking requires the insertion of the bulk amount requirement *after* the purpose to sell or offer to sell language. According to appellant, the trial court deviated from that language by informing the jury that the burden was on the prosecution to prove a "purpose or intention that said other person would use the money * * * to obtain more than bulk amount of Oxycodone for the purpose of selling or offering to sell Oxycodone." (Tr. 937.)

{¶ 111} In general, the giving of jury instructions is within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. *State v. Orians,* 179 Ohio App.3d 701, 2008-Ohio-6185, ¶ 10 (3d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 271 (1981). Under Ohio law, "[a] trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case." *Id.*, citing *State v. Thomas*, 170 Ohio App.3d 727, 2007-Ohio-1344, ¶ 15 (2d Dist.). In reviewing a trial court's jury instructions, we must consider them "as a whole, rather than viewing an instruction in isolation, and then determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *State v. Ward,* 168 Ohio App.3d 701, 2006-Ohio-4847, ¶ 29 (4th Dist.). *See also Orians* at ¶ 10 (an appellate court's review of jury instructions "must examine the specific charge at issue in the context of the entire charge, and not in isolation").

{¶ 112} A defendant's "failure to object to improprieties in jury instructions waives error on appeal absent plain error." *State v. Canter,* 10th Dist. No. 01AP-531 (Mar. 26, 2002), citing *State v. Morrison*, 10th Dist. No. 01AP-714 (Dec. 31, 2001). In the instant

case, appellant did not object to the instruction at issue, and we, therefore, review his claim for plain error. Such error "exists when, 'but for the error the trial's outcome would have been otherwise.' " *Id.*, quoting *Morrison*, citing *State v. Underwood*, 3 Ohio St.3d 12, 13 (1983).

{¶ 113} As noted, appellant contends the trial court deviated from the standard jury instructions by failing to recite from the standard instruction. While appellant challenges the order of the wording, appellant does not contend the trial court omitted any of the elements of the offense, and we note the court did instruct as to all elements, including the definition of "bulk amount." When read as a whole, we find that the instructions stated the applicable law, and appellant has not demonstrated error, plain or otherwise, by the trial court's failure to provide a verbatim recitation of the pattern instruction.

{¶ 114} Based upon the foregoing, appellant's third assignment of error is not well-taken and is overruled.

{¶ 115} Under the fourth assignment of error, appellant raises a claim of ineffective assistance of counsel. Specifically, appellant argues that his trial counsel was deficient in failing to: (1) object to improper questioning, including leading questions, (2) move for a mistrial, (3) conduct an adequate legal investigation, and (4) object to jury instructions.

{¶ 116} The Supreme Court of Ohio has adopted the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), for ineffective assistance of counsel. *See State v. Bradley,* 42 Ohio St.3d 136, 142 (1989). Under this test, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.* at paragraph two of the syllabus. In order to show prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 117} Appellant first contends that counsel was ineffective for failing to object to testimony by Detective Allen regarding observations reported to him by law enforcement personnel in other jurisdictions. Specifically, appellant argues that counsel should have objected to testimony by the detective regarding contacts made with law enforcement personnel in Florida and Virginia, including surveillance conducted by officers in those jurisdictions with respect to Robert, Richard, Kelley, and Smith. Even assuming counsel

should have objected to this testimony, appellant has not demonstrated prejudice as such evidence was cumulative of other properly admitted evidence. As previously noted, the above co-defendants all testified as to their activities in Florida and Virginia, i.e., that they obtained prescriptions from pain clinics in Florida and filled prescriptions either in Florida or Virginia. As such, appellant cannot demonstrate that the outcome of the trial would have been different but for counsel's failure to object.

{¶ 118} Appellant also challenges trial counsel's handling of the testimony of various co-defendants, including Robert, MacDonald, Carter, Anderson, Maxwell, Sparks, Jason, Smith, Richard, and Perry. Specifically, appellant maintains that counsel failed to object to leading questions and/or was deficient in handling the cross-examination of these witnesses.

{¶ 119} With respect to the testimony of Robert, appellant contends that Robert lacked personal knowledge of the source of funding for his drug trips. According to appellant, trial counsel was deficient in failing to object to the prosecutor's use of leading questions to imply Robert had such personal knowledge. Robert, however, testified that appellant approached him about taking trips to Florida and that he had an agreement with appellant in which appellant offered to pay for his expenses related to those trips. We also note that defense counsel objected during direct examination to the state's inquiry of Robert as to who funded his first trip, citing a lack of foundation. The trial court sustained that objection, leading the prosecutor to rephrase the question.

{¶ 120} Here, appellant cannot show deficient performance. Further, as reflected in the record, counsel made objections, resulting in the prosecutor rephrasing the question. *See, e.g., State v. Sayre,* 3d Dist. No. 9-12-25, 2013-Ohio-4108, ¶ 56 (where "[a]ll the objection would have done would be to cause the State to rephrase the question * * * there is no reason to believe that the objections would have affected the outcome of the case").

{¶ 121} Appellant also contends counsel was ineffective in failing to object to various instances in which the prosecutor asked leading questions of other co-defendants, including Carter, Sparks, Smith, and Perry. Pursuant to Evid.R. 611(C), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." The "broad exception" under this rule "places the decision of whether to allow leading questions within the sound discretion of the trial court." *State v. Jefferson,* 2d Dist. No. 2002 CA 26, 2002-Ohio-6377, ¶ 9. As

such, "the Ohio Supreme Court has held that the failure to object to leading questions does not constitute ineffective assistance of counsel." *Id.*, citing *State v. Jackson,* 92 Ohio St.3d 436, 449 (2001). This is so "because the failure of counsel to object may have been the result of trial strategy." *Id.* In a similar vein, "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

{¶ 122} Based upon this court's review of the record, appellant has failed to demonstrate how he was prejudiced by trial counsel's failure to object to the state's use of leading questions. To the extent appellant contends that some of the leading questions elicited inadmissible hearsay, we have previously held that the state laid a proper foundation such that the challenged statements constituted declarations by co-conspirators, and were, therefore, admissible as non-hearsay under Evid.R. 801(D)(2).

{¶ 123} Appellant contends that counsel should have objected to the state's use of a spreadsheet to "steer" MacDonald into agreeing with the state that appellant funded 22 particular drug trips. MacDonald testified, however, without utilization of the spreadsheet, that he took approximately 80 trips to Florida. He further testified that, with the exception of the first trip, appellant funded each one of those trips. While appellant contends that the state failed to lay a proper foundation under either Evid.R. 612 or 803(5) to utilize the spreadsheet, there is nothing to indicate the state would not have been able to lay such a foundation for this evidence.

{¶ 124} Appellant also contends that the prosecutor asked leading questions of Anderson without developing any foundation for personal knowledge. During direct examination, Anderson testified that appellant was "funding * * * activity for me down in Florida." (Tr. 359.) The record indicates that, during cross-examination, defense counsel elicited from the witness that his knowledge of appellant's activities was limited to what others told him as opposed to what he had observed. Counsel's decision to cross-examine the witness about his knowledge of funding rather than object to a leading question does not demonstrate deficient performance.

{¶ 125} Appellant contends defense counsel was deficient in failing to move for a mistrial following the testimony of the CI based upon his claim, previously addressed under the second assignment of error, that the state manufactured a sham conflict of interest in order to disqualify attorney Armengau. Having rejected appellant's claim that

the state acted improperly in filing the motion to disqualify, appellant cannot demonstrate prejudice by counsel's failure to move for a mistrial.

{¶ 126} Appellant further argues trial counsel failed to conduct an adequate legal investigation. Appellant points to the fact that, at the conclusion of the state's case, defense counsel made a motion for judgment of acquittal "without argument" (except as to two of the funding counts). Relying upon claims he raised under the first assignment of error, appellant maintains there were multiple legal grounds for counsel to seek an acquittal as to all counts. However, based upon our disposition of the first assignment of error, rejecting appellant's sufficiency challenge, appellant cannot demonstrate prejudice based on the failure of counsel to investigate and argue those grounds during the motion for acquittal.

{¶ 127} Finally, appellant argues that his counsel was deficient in failing to object to the trial court's jury instruction as it relates to the offense of funding of drug trafficking. In addressing appellant's third assignment of error, we found that the instruction, read as a whole, stated the applicable law, and that appellant had not demonstrated error as a result of the trial court's failure to provide a verbatim recitation of the standard jury instructions. Accordingly, appellant cannot demonstrate prejudice as a result of trial counsel's failure to object to the instruction at issue.

{¶ 128} Based upon this court's review of the record, appellant has failed to show that his trial counsel's purported deficiencies, either individually or cumulatively, affected the outcome of his trial. Accordingly, appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 129} Under the fifth assignment of error, appellant argues that the trial court's consecutive prison sentence totaling 64 years is clearly and convincingly contrary to law and/or an abuse of discretion. More specifically, appellant argues that the trial court penalized him for exercising his right to trial, and further erred by imposing, in effect, a life term.

{¶ 130} In *State v. Murphy*, 10th Dist. No. 12AP-952, 2013-Ohio-5599, ¶ 12, this court discussed the felony sentencing standard of review as follows:

> "We review a trial court's sentence to determine if it is clearly and convincingly contrary to law." *State v. Green*, 10th Dist. No. 10AP-934, 2011-Ohio-6451, ¶ 7, citing *State v. Burton*, 10th Dist. No. 06AP-690, 2007-Ohio-1941, ¶ 19; R.C.

2953.08(G). In applying this standard, we look to the record to determine whether the sentencing court considered and properly applied the non-excised statutory guidelines and whether the sentence is otherwise contrary to law. *Id.*, citing *State v. Carse*, 10th Dist. No. 09AP-932, 2010-Ohio-4513, ¶ 60; *Burton*. We are also cognizant of the two-step standard of review set forth by a plurality of the Supreme Court of Ohio in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, which asks (1) whether the trial court adhered to all applicable rules and statutes in imposing the sentence, and (2) whether a sentence within the permissible statutory range constitutes an abuse of discretion.

{¶ 131} Appellant first points to comments made by the trial court pre-voir dire, during a colloquy with appellant regarding the state's offer of a plea bargain. Appellant notes that the pre-voir dire transcript indicates the state offered appellant a 20-year plea bargain. Appellant argues that, during that exchange, the trial court discussed two "similarly situated" defendants. (Pre-Voir Dire Proceeding, 3.)

{¶ 132} Although the pre-voir dire transcript is brief, the record indicates that the state indicated it had "offered 20 years ODRC," and that appellant had "rejected the 20-year offer." (Pre-Voir Dire Proceeding, 2.) In addressing this issue, the trial court made the following remarks on the record:

> THE COURT: Well, and I don't know what's going to happen. I believe it sincerely, you're innocent unless otherwise proven guilty. I'm sure the discussions as to what sentence I gave to an individual similarly situated, and I could have gotten a lot higher than that. I think a lot of my colleagues would have.
>
> But obviously a sentence you give following a trial is frequently different than ahead of time because there's more charges that end up being there. So that's the real reason for that. It wasn't a rent for going to trial. It was simply there were more charges. I think in fairness I wanted to make sure you were aware of that sentence as well.
>
> If the two of you at any time want to start moving a little bit, and I think there's probably plenty of room for negotiations, but let's not let the trial get too deep in before those discussions start to take place.

(Pre-Voir Dire Proceeding, 3.)

{¶ 133} According to appellant, the above comments are similar to those made by the trial court in *State v. Howard,* 5th Dist. No. 2012-CA-00061, 2013-Ohio-1972, ¶ 85, in which that court held that comments by the trial court "created the appearance that it would punish [the defendant] more severely for exercising his right to a jury trial."  In *Howard,* the reviewing court was concerned by statements by the trial court that, "even if [the defendant] were to agree to plead on the day of trial he would receive a more severe penalty."  *Id.* at ¶ 86.

{¶ 134} In *State v. Mayle,* 7th Dist. No. 04 CA 808, 2005-Ohio-1346, ¶ 45-46, the court noted:

> A defendant should never be punished for exercising his right to trial or refusing to enter into a plea agreement. * * * Such a punishment would impair the constitutional right to a trial by creating a chilling effect upon a defendant's ability to exercise his constitutional right. * * * Accordingly, a trial court may not augment a sentence because a defendant chooses to force the government to prove his guilt, " 'no matter how overwhelming the evidence of [defendant's] guilt.' "
>
> But there are legitimate reasons why a trial court may sentence a defendant more harshly after a trial on the merits than it may have after a guilty plea. First, the United States Supreme Court has recognized the propriety of offering lenient sentences in exchange for a guilty plea. * * * It is proper to offer a more lenient sentence in exchange for a guilty plea because a defendant's acknowledgement of guilt has shown a willingness to assume responsibility for his conduct and has taken the first step toward rehabilitation. * * * Second, a trial court knows more details about the facts of the case, the flavor of the event, and its impact upon the victims after a trial on the merits than it would after a guilty plea. * * * This "more real and accurate appraisal of the circumstances which brought the defendant to the bar of justice" will "almost inevitably * * * affect the judge's consideration of what penalty appears most appropriate." * * * Accordingly, the fact that the sentence imposed after trial is greater than the sentence the State offered to recommend in exchange for a guilty plea does not demonstrate that the trial court acted improperly.

{¶ 135} In order to "determine vindictiveness, we look to see whether the record affirmatively shows retaliation as a result of the rejected plea bargain."  *State v. Paul,* 8th Dist. No. 79596 (Feb. 14, 2002).

{¶ 136} In the present case, the comments by the trial court do not raise the same concerns at issue in *Howard.* Under the facts of that case, the trial court made clear on the record that it "absolutely" agreed with the prosecutor's statement that the state's plea offer of 12 years was only valid prior to trial, and that the defendant would receive a greater sentence if he were to agree to plead on the day of trial. *Id.* at ¶ 84.

{¶ 137} Here, the record does not reflect that the trial court impermissibly punished appellant for exercising his right to trial. During the sentencing hearing, the trial court cited the "purposes and principles of sentencing." (Tr. 996.) The court noted its agreement as to "the guidelines set forth that there must be a consideration for a minimum sentence," and that the sentence "must be commensurate and not demeaning with the seriousness of the crime." (Tr. 997.) The court further noted that a sentence "should not be disproportionate. And what I mean by this is just because you can give an effective life sentence * * * that doesn't make it appropriate." (Tr. 997.)

{¶ 138} Regarding the trial testimony, the trial court cited the fact the enterprise did not operate based upon "single trips," but, rather, "[t]here were three or four individuals in the car every time," resulting in "the purchase and distribution of literally thousands of drugs." (Tr. 998.) On this point, the court observed: "I don't think the impact can be overstated, * * * we saw it with the people that were testifying what happens to their lives." (Tr. 998.)

{¶ 139} The court next discussed the statutory seriousness and recidivism factors, stating in part: "As noted in the presentence report, the seriousness factor of organized activity was noted. None of the less serious factors were identified." (Tr. 999.) With respect to the recidivism factor, the court cited the fact that the presentence investigation report ("PSI") "points out that four of the six separate factors making recidivism likely were present." (Tr. 1000.) The court found that appellant has "done a terrible job on supervision for prior offenses. And he was on supervision when this offense occurred having just been placed on federal release supervision just months before this activity came." (Tr. 1000.) The trial court further cited the fact that appellant's "criminal history is extensive with prior prison terms, not only by the feds, by me granting judicial release only having to revoke it." (Tr. 1000.) The court also found "absolutely no remorse" on the part of appellant. (Tr. 1000.)

{¶ 140} The trial court, citing appellant's "extensive prior record," and "the factors regarding seriousness and recidivism," determined that "consecutive sentences are necessary to both punish the offender and protect society." (Tr. 1001.) The court reiterated the fact that appellant "was under four years of federal supervision as of September '09 for a prior drug distribution when this all started," and that "each trip was not a single trip. There were multiple individuals buying multiple amounts of drugs at each one of those individual trips." (Tr. 1002.)

{¶ 141} The trial court then discussed the range of sentences available, stating in part:

> If I just gave him the midrange, and on the felonies of the first degree, it's 3 to 11; 7 is spot in the middle. And I think given his record, the activity, the recidivism, all of that would easily support a midrange sentence and a consecutive sentence. But if I did the midrange alone, he's over 182 years. I don't think that's appropriate. Even if I gave him the minimum of 3, which is a struggle, on the funding alone, it's over 75 years. Again I have difficulty with that.
>
> But again given the nature of [the] crime and the activity and the defendant's record, there's just so much I can do. I have not been given a whole lot to work with.

(Tr. 1002-03.)

{¶ 142} Upon review, the record indicates that the trial court properly considered the statutory purposes and principles of sentence, as well as the seriousness and recidivism factors. In addition to imposing a seven-year sentence for the offense of engaging in a pattern of corrupt activity, the trial court imposed three-year sentences as to each of the aggravated funding of drug trafficking counts. The minimum term for a first-degree felony is three years. R.C. 2929.14(A)(1). While the trial court imposed consecutive sentences, the court noted on the record, after a consideration of the statutory factors and the PSI, the basis for the sentence imposed. Further, "[w]hen an accused rejects the offer of a plea bargain, elects to exercise the right to trial, and is found guilty, the court is not required to impose sentence within the parameters discussed in the rejected plea bargain." *Paul.* Upon review, the record does not support appellant's claim that the court's sentence was based on vindictiveness, nor is the sentence contrary to law.

{¶ 143} Appellant also raises a proportionality argument, asserting that he has effectively received a life sentence given his current age. Appellant argues that the trial court, by ordering 19 of the 3-year prison terms for aggravated funding of drug trafficking to be served consecutively to each other, failed to incorporate the principle of incremental punishment as found in the federal sentencing guidelines.

{¶ 144} In general, "a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." *McDougle v. Maxwell,* 1 Ohio St.2d 68, 69 (1964). The Supreme Court of Ohio has held that "proportionality review should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively." *State v. Hairston,* 118 Ohio St.3d 289, 2008-Ohio-2338, ¶ 20. Thus, "[w]here none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id.* Further, this court has noted that "[t]he more crimes an individual commits, the more likely it is that the ultimate prison sentence will indeed be a lengthy one." *State v. Watkins,* 10th Dist. No. 13AP-133, 2013-Ohio-5544, ¶ 19.

{¶ 145} In the instant case, the trial court's sentence was within the statutory range. While appellant argues that his sentence would be less severe under the federal sentencing guidelines, we note that the federal guidelines "operate under a rigid system," and "differ markedly from the Ohio sentencing guidelines." *State v. Agner,* 3d Dist. No. 1-2000-04 (Aug. 3, 2000). *See also State v. Blackley,* 8th Dist. No. 100574, 2014-Ohio-3140, ¶ 15 ("Sentencing in Ohio is not accomplished according to a tightly controlled grid system similar to federal sentencing guidelines."). Upon review, we find unpersuasive appellant's contention that the trial court's sentence is arbitrary, unreasonable or unconscionable. Accordingly, appellant's fifth assignment of error is hereby overruled.

{¶ 146} Based upon the foregoing, appellant's first, second, third, fourth, and fifth assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are hereby affirmed.

*Judgments affirmed.*

TYACK and KLATT, JJ., concur.

_____