THE STATE OF OHIO, APPELLEE, *v.* DUERR, APPELLANT.

(No. C-810761—Decided November 17, 1982.)

*Mr. Simon L. Leis, Jr.,* prosecuting attorney, *Mr. William E. Breyer, Mr. Arthur M. Ney* and *Mr. R. Thomas Moorhead,* for appellee.

*Mr. Wm. Stewart Mathews II, Mr. James M. Rueger* and *Mr. H. Fred Hoefle,* for appellant.

PALMER, P.J. The defendant-appellant, Carol Duerr, was indicted on a charge of the aggravated murder of her husband, Raymond Duerr. Indicted with her on the same charge were her daughter, Catherine Duerr, and Dennis Goerler. Separate trials were requested and granted. In due course, an evidentiary hearing was held on the defendant's motion to suppress, heard by stipulation along with similar motions by the other two defendants, and the motion was overruled. The matter then proceeded to trial by jury, at the conclusion of which the defendant was found guilty as charged and was sentenced as appears of record. Appeal was timely filed, with three assignments of error raised for review, considered here in the order of presentation.

For her first assignment of error, the defendant asserts that the trial court erred in denying her motion to suppress an inculpatory statement said to have been involuntarily given and to have been extracted in the absence of appellant's attorney. This assignment of error may be said to proceed in two parts: first, defendant argues that the length of time she spent at police headquarters, her state of health, both mental and physical, and the circumstances of her ultimate confrontation by police after they had first secured inculpatory statements from Catherine Duerr and Dennis Goerler, all combine to deprive the statement she made to police of its voluntary and knowing nature, requiring — it is argued — its suppression. Second, the defendant argues that the statement was taken from her after she had requested and was denied the assistance of counsel, and, in any event, after the police were aware of the fact that she was represented and that her counsel was attempting to reach her. For the reasons hereinafter set forth, we find neither argument to possess merit.

As to the first argument under this assignment of error, we simply find nothing in the record which would compel or require the conclusion of the trier of fact that the statement was taken under circumstances which, by virtue of their coercive, unduly suggestive, or other improper nature, deprived defendant's statement of its voluntary character. The defendant points, in support of her thesis, to her prolonged detention, her inexperience with the criminal justice system,

her argued lack of nourishment and sleep, and her asserted physical illness, together with what is urged to have been the suggestive nature of the interrogation.[1] Yet the record convincingly demonstrates that from the time defendant arrived at the police station until she was actually implicated in the crime, she was under no suspicion of complicity and under no restraints.

Thus, defendant and her two companions arrived at police headquarters at 6:00 p.m. on May 20, 1981. They were seated in a general lounge area until the defendant was called for an interview that lasted from 7:00 to 8:45 p.m. After the interview, defendant returned to the lounge area and remained there until Dennis Goerler and Catherine Duerr implicated her during the early morning hours of the 21st. During this period, she made and received a number of telephone calls, left the station unaccompanied to purchase medicine for Goerler, went to the restroom several times, was served food by the police, and spent most of the balance of the time in the lounge area of the station with immediate access to the outside. Not until first Goerler and then the defendant's daughter actually implicated the defendant did what may be called a custodial interrogation commence, at about 6:30 a.m. It was at this time that the defendant was advised of her constitutional rights, and at about 7:20 a.m. that

she made the inculpatory statement in question. We conclude that, under the totality of circumstances, the trial court had before it ample credible evidence from which to conclude that the statement at issue was made voluntarily and knowingly. *State* v. *Edwards* (1976), 49 Ohio St. 2d 31 [3 O.O.3d 18], vacated on other grounds (1978), 438 U.S. 911.

The second argument under the first assignment of error deals with whether or not defendant's constitutional right to counsel was violated. This argument consists of two points: first, the defendant claims she asked for the assistance of counsel during the interrogation process and was told she did not need it. This was flatly denied by the officers involved in the questioning. Some independent confirmation of the police position is supplied by the numerous telephone calls made by the defendant during the evening, none of which was to the counsel with whom she had conferred about estate matters earlier in the day, and who represented her interests.[2] In any event, a clear question of credibility was presented to the court, which it resolved against the defendant. We know of no reason why it was not within the power of the court to do so. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230 [39 O.O.2d 366].

The second aspect of this argument concerns a telephone call to the station made sometime on the morning of May

---

[1] We refer to the companion case of *State* v. *Goerler,* Hamilton App. No. C-810778, unreported, released this day, for a recital of the sequence of events that marked the questioning and interrogation of the parties on the evening of May 20th and early morning hours of May 21st, as well as the events preceding this period of questioning.

[2] It seems clear that the police were aware that defendant's counsel, William Stewart Mathews II, represented her in her presumed capacity as administratrix of her husband's estate, since Mathews had contacted the

sheriff's office during business hours on the 20th to inquire about the return of personal property of the deceased held by that office or by the coroner. It is not contended that the authorities knew then that Mathews was to represent her in criminal charges, or that Mathews had instructed them not to question her; indeed, at that time, the defendant was not under suspicion, and no reason for such precautions could have arisen. It was not until an early morning call to Mathews by the defendant's daughter, Mary Beth, that he was aware of his client's possible jeopardy on criminal charges.

21st by the defendant's attorney. It is agreed that such a call was made and received, and that the attorney was told that interrogation of the defendant had already ceased because her statement had been completed. It is further agreed that the defendant's statement was completed at about 8:10 a.m. The problem arises from testimony adduced on behalf of the defendant that the call was made to the station shortly after 7:45 a.m., which would obviously have been before the statement had been completed and would, if accurate, raise the constitutional problem addressed in *Escobedo* v. *Illinois* (1964), 378 U.S. 478, and *Edwards* v. *Arizona* (1981), 451 U.S. 477. See, also, *State* v. *Burt* (May 14, 1980), Hamilton App. No. C-790438, unreported. An issue of fact was, however, presented to the trial court as to when this call was actually made. The officer who received the attorney's call, Captain Henke, the supervising officer in the investigation, testified quite positively that it was not made until *after* the defendant's statement had been completed, which would necessarily place the call after 8:10 a.m.

The defendant argues that we are able to, and should, find the trial court's adverse resolution of this factual dispute to be contrary to the manifest weight of the evidence. This would require, obviously, that we discount Captain Henke's testimony on the timing of the call, and accept in its most favorable light that of Mathews, the defendant's attorney. He testified that he had received the call from Mary Beth Duerr alerting him that the defendant had been at the station all night at "approximately" 7:45 a.m. and that, after completing this call, he "immediately" called the station and spoke to Henke. It would also require that we discount the thrust of his testimony that the defendant returned his call at "approximately 8:10 or 8:15 a.m.," *after* she had finished her statement and the subsequent fingerprinting and photographing. We find no justification, under these circumstances,

for substituting our judgment on the issue for that of the trier of facts, and decline to do so.

The first assignment of error is accordingly overruled.

The defendant's second assignment of error argues that the trial court erred in overruling her objection to the introduction of her inculpatory statement into evidence where, it is insisted, there had been insufficient evidence of the *corpus delicti* first established. While the rule urged by the defendant, *viz.*, that some evidence of the death of the victim, and a criminal agency as the cause of that death, must precede the introduction of a confession by the defendant, is a correct one (*State* v. *Maranda* [1916], 94 Ohio St. 364), it is equally clear that:

"The quantum or weight of such additional or extraneous evidence is not of itself required to be equal to proof beyond a reasonable doubt, nor even enough to make a *prima facie* case. * * *" *State* v. *Edwards, supra,* paragraph 1c of the syllabus.

As noted by Chief Justice O'Neill in *Edwards, supra,* at 35-36:

"Considering the revolution in criminal law of the 1960's and the vast number of procedural safeguards protecting the due-process rights of criminal defendants, the *corpus delicti* rule is supported by few practical or social-policy considerations. This court sees little reason to apply the rule with a dogmatic vengeance.

"In considering the minimal requirements of *Maranda* and in evaluating the evidence in the light of the ordinary customs of our times, we conclude that the prosecution did produce *some* evidence tending to corroborate the material elements * * * [of the crime]."

See, also, *State* v. *Black* (1978), 54 Ohio St. 2d 304 [8 O.O.3d 296].

Here, the record reveals that substantially more than "some" evidence of the *corpus delicti* preceded the introduction of the inculpatory statement of the defendant. The first witness, a co-worker of the

deceased, testified that Mr. Duerr was alive at shortly after 5:00 p.m. on May 19, since he had spoken to him about then. He further testified that he was told by the defendant the following morning that Mr. Duerr had been shot the preceding evening. He then verified photographic exhibits, subsequently received into evidence, one of which was a morgue photograph of the deceased clearly showing the bullet wound in the deceased's head. The second and third witnesses, neighbors of the Duerrs, testified that on the evening of the 19th, the defendant told them that her husband had been shot. The second witness testified that the defendant told him she thought her husband was dead. The fourth witness, a paramedic, examined the body, found no respiration or heartbeat, and then described the trauma to the head of the deceased. The sixth witness, Lt. Hulgin, examined the scene at 9:45 p.m. on the 19th, and described finding decedent's bloodstained wearing apparel on the stairway, other blood stains on the bathroom doorjamb, a spent cartridge casing lying on the floor, and the body of the deceased in his bedroom. He further testified that he found a bullet hole in the bedroom wall, and blood on the blanket on the bed along with another spent cartridge casing. All of the foregoing testimony preceded the introduction of the statement of the defendant and was ample, we conclude, to establish the *corpus delicti* under the *Edwards* and *Black* rationales. *State* v. *Latscha* (Nov. 18, 1981), Hamilton App. No. C-800844, unreported. The second assignment of error is without merit and is overruled.

The third assignment of error is phrased as follows:

"The trial court erred to the substantial prejudice of the defendant-appellant by admitting into evidence statements of alleged co-conspirators without first establishing the conspiracy by independent proof, or were [*sic*] not made in furtherance of the conspiracy."

The reference in this assignment to "statements of alleged co-conspirators," it must be understood, does *not* refer to the formal taped confessions of Dennis Goerler and Catherine Duerr. Their confessions implicated the defendant in a conspiracy of the three to kill Raymond Duerr, and were taken during the early morning hours of May 21st. Both confessions preceded (and caused) the custodial interrogation of the defendant, resulting in her inculpatory statement, which ended at 8:10 a.m. These taped confessions of Goerler and Catherine Duerr were never offered or received into evidence, although referred to in passing, from time to time, primarily to establish the change in status of the defendant from mere witness to prime suspect, requiring as to her the full panoply of constitutional instructions. Rather, the assignment of error must be held to refer to various statements made to witnesses by Goerler or Catherine Duerr, or actions taken by both, but principally Goerler, generally prior to the homicide. These statements, too lengthy to set out in detail herein but which are explored in appellant's brief, were introduced into evidence *after* the court received into evidence the confession of the defendant. The defendant's position may fairly be summarized by the following statement of her argument:

"However, in the case at hand, the Court allowed statements made by alleged co-conspirators before a conspiracy had been established, before any independent proof had been offered concerning said conspiracy, and from a review of the record, it can be seen that the only evidence that a conspiracy ever existed or that the alleged co-conspirators and Defendant-Appellant were involved, *was the hearsay statement of Defendant-Appellant,* which was admitted in the State's case in chief *and which is not independent proof required by the Rule and the case law previously cited."* (Emphasis added.)

The "Rule" to which reference was made in the quotation above, and upon the

interpretation of which this aspect of the issue raised in the third assignment of error depends, is Evid. R. 801(D)(2)(e), which provides:

"(D)   Statements which are not hearsay. A statement is not hearsay if:

"* * *

"(2)   Admission by party-opponent. The statement is offered against a party and is * * * (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy *upon independent proof of the conspiracy.*" (Emphasis added.)

Unless the inculpatory statement[3] of the defendant may be said to constitute "independent proof" of the conspiracy, the defendant is quite correct that the statements of the co-conspirators would not fall within Evid. R. 801(D)(2)(e) and would thus be inadmissible hearsay, since no other proof of the conspiracy exists in the record. We simply disagree with the defendant that the statement of the defendant, which concededly gave substance to the charge of a conspiracy of the three, was not such "independent proof" of the conspiracy as would satisfy the requirements of the rule.

Thus, while the point appears to be one of first impression in Ohio, we are instructed by a variety of decisions interpreting the federal analogue of the Ohio rule, Fed. R. Evid. 801(d)(2)(E). It will be noted that while the federal rule does not contain an explicit requirement that there be independent proof of the conspiracy, as found in the Ohio rule, the requirement of independent proof has nevertheless been engrafted onto the federal rule by case law interpreting the section. These cases follow the reasoning in *Glasser* v. *United States* (1941), 315 U.S. 60, 74, 75, that without proof *aliunde* of the conspiracy, "hearsay would lift itself by its own boot straps to the level of competent evidence." One statement of the rule was made in the following fashion:

"Cambindo argues that the court admitted hearsay evidence that did not fall under the co-conspirator exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(E), in that certain statements were admitted into evidence prior to a decision as to the declarant's status as a conspirator. The law is well settled in this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to eventual connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances. *United States* v. *De Fillipo,* 590 F.2d 1228, 1235-36 (2d Cir. 1979) (following *United States* v. *Geaney,* 417 F.2d 1116, 1120 [2d Cir. l969], *cert. denied,* 397 U.S. 1028, 90 S. Ct. 1276, 25 L.Ed.2d 539 [1970])." *United States* v. *Cambindo Valencia* (C.A. 2, 1979), 609 F. 2d 603, 630.

See, also, *United States* v. *Papia* (C.A. 7, 1977), 560 F. 2d 827; *United States* v. *Macklin* (C.A. 8, 1978), 573 F. 2d 1046; *United States* v. *James* (C.A. 5, 1979), 590 F. 2d 575; *United States* v. *Graham* (C.A. 8, 1977), 548 F. 2d 1302; *United States* v. *Williams* (C.A. 8, 1976), 529 F. 2d 557; *United States* v. *Sanders* (C.A. 8, 1972), 463 F. 2d 1086. See, generally, Graham, Handbook of Federal Evidence (1981), Section 801.25; 1Weinstein & Berger, Weinstein's Evidence (1982), Paragraph 104[05], where a review of the federal circuits' holdings on the issue is listed at footnote 29 therein.

We take it, therefore, that the Ohio rule, as expressed, and the federal rule, as interpreted, are substantially the same. It

---

[3] This is improperly characterized by the defendant as "hearsay"; of course, it is not. Evid. R. 801(D)(2)(a) quite clearly excludes from hearsay those statements offered against a party consisting of his own statements.

then becomes relevant to examine federal decisions dealing with the issue of whether a confession of conspiracy by a defendant will constitute evidence *aliunde,* or independent proof, sufficient to bottom out-of-court statements of co-conspirators. These authorities, we conclude, sustain the state's position that statements of the defendant probative of the existence of a conspiracy will suffice to furnish the independent proof of the conspiracy requisite under the rule. Thus, in *United States* v. *Gallagher* (C.A. 7, 1971), 437 F.2d 1191, the defendant argued that there was no evidence connecting him with his brother in a conspiracy to defraud, so that out-of-court statements of this brother and an unindicted co-conspirator could not properly have been used against him. The court noted:

"The flaw in appellant's argument which makes it inapposite is that here the record discloses that there is independent evidence of appellant's connection with the conspiracy which serves to make the declarations of his brother * * * admissible against appellant." *Id.* at 1193.

The independent proof, noted the court, consisted of a number of . inculpatory statements made by the appellant himself to various witnesses. Similarly, in *United States* v. *Cerone* (C.A. 7, 1971), 452 F. 2d 274, a case of conspiracy to use interstate facilities in aid of illegal gambling, the court framed the issue as follows:

"Finally in this regard, defendants argue that it was error to admit the testimony of Bombacino as to extra-judicial declarations and acts of the defendants absent prior independent proof of the existence, scope and membership of the conspiracy. It is axiomatic that such declarations and acts of a co-conspirator may not be admitted in evidence against a defendant absent independent evidence establishing his participation in the conspiracy. *E.g., Glasser* v. *United States,* 315 U.S. 60, 74-75, 62 S. Ct. 457, 86 L.Ed.

680 (1942); *Oltman* v. *Miller,* 407 F.2d 376, 378-379 (7th Cir. 1969); *United States* v. *Stadter,* 336 F.2d 326, 329 (2d Cir. 1964); *cf. Logan* v. *United States, supra,* at 144 U.S. 309, 12 S. Ct. 617. Defendants proceed from that well-established principle to assert that there was no such independent evidence here, or, in the alternative, that if there was independent evidence it was insufficient to validate the admission of Bombacino's testimony." *Id.* at 283.

Rejecting this argument, the court noted that although courts have admitted such evidence on a theory that the defendant's inculpatory statements constituted admissions against interest and hence were admissible in themselves, "'* * * the better view is that such admissions are not hearsay at all and are admissible absent other reasons for exclusion. * * * As evidence independent of the hearsay statement of a co-conspirator, such admissions may quite properly constitute corroborative evidence sufficient to justify the admission of a co-conspirator's hearsay declarations." *Id.* at 284.

In *United States* v. *Cirillo* (C.A. 2, 1974), 499 F.2d 872, the court concluded that the non-hearsay evidence of a conspiracy, the principal item of which was a "devastatingly incriminatory telephone conversation" with the defendant, *id.* at 884, was sufficient to admit hearsay statements of co-conspirators. In *United States* v. *Rodriguez* (C.A. 5, 1975), 509 F.2d 1342, the rule is encapsulated in the following extract:

"Appellant first contends that extra-judicial statements made by co-defendants Castro, Arteaga, and Yepez, outside the presence of the appellant were improperly admitted into evidence. We hold that these statements, although hearsay, were properly admitted as declarations of co-conspirators made during the course of the conspiracy and in furtherance of it.

"Of course, the government must introduce sufficient independant [*sic*]

evidence of the existence of a conspiracy and of appellant's participation therein before the judge may allow declarations of the co-conspirator, made outside of the presence of the defendant, to go to the jury. *United States* v. *Apollo,* 476 F. 2d 156, 157 (5th Cir. 1973); *Montford* v. *United States,* 200 F. 2d 759, 760 (5th Cir. 1952). The test of sufficiency is whether the other evidence, *aliunde* the hearsay, would be sufficient to support a finding that the defendant himself is a conspirator — that is, whether the government has established a prima facie case of the existence of a conspiracy and of defendant's participation therein. *United States* v. *Oliva,* 497 F.2d 130, 132-33 (5th Cir. 1974).

"The trial judge properly required that the government show the appellant's participation in the conspiracy by evidence other than hearsay before allowing the jury to hear any of the extrajudicial statements of the co-conspirators. *The government met this burden by having Agent Scrocca describe the July 16, 1971 meeting with Rodriquez [i.e., the defendant]. The judge then held that the government had made a sufficient showing that Rodriquez was a member of the conspiracy.* We believe the judge's ruling that sufficient evidence of a conspiracy and of defendant's participation therein had been presented was correct." (Emphasis added.) *Id.* at 1346.

We conclude from these authorities, as well as from the logic of the problem, that the non-hearsay admissions against interest of the defendant may be considered as establishing the "independent proof of the conspiracy" necessary to satisfy the requirements of Evid. R. 801 (D)(2)(e), removing from hearsay disabilities the statements of co-conspirators made during the course and in furtherance of a conspiracy. What, after all, is more persuasive or reliable evidence of the existence of a conspiracy than the admission by the defendant, freely and voluntarily given, that such conspiracy did in fact exist and included her among its members?

Finally, the defendant argues under her third assignment of error, that since at least some of the statements of the co-conspirators were made after the conspiracy had arguably terminated, they were not made "during the course and in furtherance of the conspiracy" within the meaning of Evid. R. 801(D)(2)(e).[4] This argument was, however, addressed by the Supreme Court in *State* v. *Shelton* (1977), 51 Ohio St. 2d 68 [5 O.O.3d 42], vacated on other grounds (1978), 438 U.S. 909, where the syllabus holds:

"1. A conspiracy to commit a crime does not necessarily end with the commission of the crime.

"2. A declaration of a conspirator, made subsequent to the actual commission of the crime, may be admissible against any co-conspirator if it was made while the conspirators were still concerned with the concealment of their criminal conduct or their identity. * * *"

We find this statement of the law necessarily dispositive of all of the instances of statements by co-conspirators cited by the defendant, at least up to the point where each of the two co-conspirators made his formal taped confessions approximately a day and one-half after the homicide.[5] Until that point, both

---

[4] The defendant also argues that the *crime* of conspiracy terminates when its objects are committed. R.C. 2923.01. This is offered to supplement the thrust of the above-quoted language of Evid. R. 801(D)(2)(e), but has, in fact, no bearing on the instant issue. The defendant was not indicted for the specific crime of "conspiracy" as defined in R.C. 2923.01, nor tried under its provisions. The question, rather, involves the common-law concepts of conspiracy as that word is used in the evidence rules in question.

[5] But, see, Giannelli, Ohio Evidence Manual (1982), Section 801.15, at 15-16, for the contrasting federal rule.

Goerler and Catherine Duerr were still obviously concerned with the concealment of their criminal conduct. All such statements, which include nearly all of those instanced to us by the defendant, were therefore either made during the course and in furtherance of the conspiracy, or were made while the conspirators were still concerned with concealment of their criminal conduct.

The only "statements" of the co-conspirators cited to us by the defendant that might arguably lie beyond the obvious scope of *Shelton* occurred during the rebuttal testimony of Lt. Hulgin. A review of the record reveals that the following was the extent of that testimony:

"Q. Officer, would you again state your name and spell your last name?

"A. My name is Raymond Hulgin, H-u-l-g-i-n.

"Q. And you were previously sworn in this same cause, officer, if you remember. Officer, directing your attention again to the evening of May 20 and early morning hours of May 21, 1981, did you have an occasion to take a statement from Dennis Goerler?

"A. Yes, sir, I did.

"Q. And at any point did you advise Mr. Goerler of his constitutional and Miranda rights?

"A. Yes, I did.

"Q. And when did you take a statement from him in relation to that fact?

"A. In relation to advising him of his rights?

"Q. Yes.

"A. His statement was taken immediately following the advice of his rights.

"Q. What happened after that statement was concluded?

"A. Dennis Goerler was placed under arrest and charged with aggravated murder.

"Q. And what happened to him physically after being placed under arrest?

"A. He was processed as a prisoner; that is, he was fingerprinted and photographed and the necessary paperwork was made out concerning the charges placed against him.

"Q. Did he remain in the custody of the Hamilton County sheriff at that time?

"A. Yes, he did.

"Q. And does he so remain even until today?

"A. Yes, he is.

"MR. MOORHEAD: Thank you very much, officer. No further questions."[6]

It is immediately apparent that no "statement" of the co-conspirator, Goerler, was introduced or attempted, merely the *fact* of its having been taken, a fact which required precedent *Miranda* warnings and occasioned his subsequent arrest and detainment. The defendant argues that the jury may well have drawn invidious conclusions from this recitation, but that is not to argue that the testimony of Lt. Hulgin was inadmissible under Evid. R. 801(D)(2)(e), the challenge posed by the assignment of error. It was not so inadmissible; the testimony does not relate an out-of-court statement at all.

The defendant's third assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

DOAN and KLUSMEIER, JJ., concur.

---

[6] We find no specific objection to this testimony in the record. There was considerable argument centering on Evid. R. 801(D)(2)(e) in connection with a Crim. R. 29 motion at the conclusion of the state's case, renewed at the end of all the evidence, but no attempt to relate the above rebuttal testimony directly to that argument.