[Cite as *State v. Wallace*, 2017-Ohio-9187.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-160613 |
| | | TRIAL NO. B-1403591C |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| PIANTE WALLACE, | : | |
| | | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 22, 2017



*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Farrish Law Firm* and *Michaela M. Stagnaro*, for Defendant-Appellant.

**DETERS, Judge.**

{¶1} Defendant-appellant Piante Wallace and two codefendants, Tristian Herron and Clevester Steele, were originally indicted for aggravated murder, murder, and aggravated robbery, with accompanying firearm specifications, for the death of Markeith Peek. Following a jury trial, Wallace was convicted of murder under R.C. 2903.02(B), with an accompanying firearm specification. We find no merit in his six assignments of error, and we affirm his conviction.

### I. Factual Background

#### A. The Murder

{¶2} The record shows that on June 18, 2014, Eugene Amison, who was acquainted with both Steele and Herron, was spending time on Neave Street in lower Price Hill. Amison was sitting next to Steele, when he overheard Steele tell someone on the phone, "I got a lick for you." After a pause, Steele said, "[T]his Markeith dude." Unbeknownst to Steele, Amison and Peek had been friends since childhood. Amison knew that that conversation meant that Steele and another person were planning to rob Peek.

{¶3} Amison called Peek to warn him. Peek said that he was not worried, but told Amison, "You better go get the ham," meaning a gun. Amison arranged to give Peek his 9 mm pistol. They met up and walked to Neave and Storrs Streets. Peek liked to wear flashy clothes, and stood out with his yellow pants and multi-colored gym shoes.

{¶4} At approximately 7:00 p.m., Amison and Peek went to sit on a wall on Neave Street. Peek told Amison, "I ain't letting these dudes chase me off." Amison

tried to convince Peek to "walk off and let it die down like." Peek refused. Just then, a man that Amison later identified as Wallace walked toward them.

{¶5}  Amison testified that Peek was standing in the intersection of Neave and Storrs Streets when Wallace walked up Neave Street toward Peek with his gun drawn.  Peek tried to draw his own gun, but Wallace shot first.  Peek returned fire, but he had already been shot.  Peek was "just too slow and too late."  After Peek had been shot, Wallace ran down Neave Street.

{¶6}  Peek tried to cross the street, but he was limping.  He fell in the middle of the street.  While he was down, Herron walked up and attempted to grab Peek's cell phone and gun.  But Peek held onto his gun and shot at Herron four or five times.  Herron managed to take the cell phone, a white Samsung model, and fled down Storrs Street.

{¶7}  People in the area began to panic.  Peek's friends gathered around him as he lay in the street.  Someone took the gun and another took a baggie of heroin that Peek had been carrying.  The gun was returned to Amison the next day.

### B.  Witnesses at the Scene

{¶8}  That same evening, Tyra Williams and Virginetta Bess sat outside in front of their duplex at 646 Neave Street, across from Henry's Market.  Both women knew Peek from the neighborhood.  Earlier that day, Peek had stopped at Williams's apartment and asked if she would charge his cell phone.  She agreed, and he left it with her.  Bess also had a conversation with Peek about 30 minutes before the murder.

{¶9}  Subsequently, both women saw Wallace walk by on his way to Henry's Market.  Bess said that Wallace stood out because he very tall and thin, and he was

dressed all in black. He was so tall that Williams asked him what basketball team he played for. He replied that he had played for Taft High School.

{¶10} Wallace went in Henry's Market. When he came out, Williams saw him turn right and walk toward Storrs Street. Wallace stopped between a corner store that had been closed and a former restaurant with a covered entranceway. Williams stated that it looked to her like Wallace was "hiding in that little spot * * * just standing there hiding."

{¶11} A short time later, Peek returned to pick up his cell phone from Williams. When he left, he walked up Storrs Street. As Peek was walking up the street, Williams heard shots. She saw Wallace come from the area of the closed corner store. Peek was running, and she saw him fall. She said that the "[d]ude in black" shot Peek and fled down St. Michael Street. She also saw Herron standing on Storrs Street when the shots were fired. He ran toward Peek after the shots were fired.

{¶12} Williams ran up to Peek, and she and others tried to stop the bleeding that was coming from a hole in his back. She said that Peek was in pain and kept repeating that he could not feel his legs. He was eventually taken to the hospital, where he died.

{¶13} Bess heard the same gunshots, but a parked vehicle blocked her view of the shooting. She looked down the street and saw Peek lying on the ground. As she called 911, she saw Wallace run down Neave Street and turn left on St. Michael Street.

### C. Actions the Day of the Murder

{¶14} Ryan Irwin is Steele's cousin. On the day of the murder, Irvin had asked Steele for a ride to a relative's house. Steele drove a gold Hyundai Sonata,

4

which was owned by Raven Herron, Herron's sister, with whom Steele had a child. Steele picked up Irwin, who sat in the front passenger seat. They drove to Raven's home for a brief visit and then picked up Herron. Then, Steele drove to the Fay Apartments and picked up Wallace, whom Irvin did not know.

{¶15} As Steele drove to lower Price Hill, Herron and Wallace sat in the back seat. Wallace had a gun in his lap. To Irvin's knowledge, no one else had a gun. Wallace said that he needed money, and Steele and Herron echoed that sentiment. Irvin heard Herron and Wallace say that they wanted "to rob somebody." Irvin became uncomfortable, but no further discussion occurred.

{¶16} When they reached State Street, Herron got out of the car. Steele drove around the block a few times and eventually parked on a side street behind a school. Irvin became frustrated that he was not getting to his destination, but Steele told him, "Just hold on, be cool, bruh, I got you." Wallace got out of the car, walked up the street, and turned the corner. Steele also got out and began talking on his phone while pacing back and forth. Irvin heard Steele say something about "what he had on."

{¶17} A short time later, Irvin heard two gunshots, followed seconds later by five more. Irvin wanted Steele to leave, but Steele had jumped in the back of another car driven by an unknown driver. Steele returned within five minutes. He then drove with Irvin back to State Street and picked up Herron. Steele then drove to a McDonald's some distance away and picked up Wallace. Wallace stated that someone had drawn a gun on him, and Wallace "had to get him." Steele then stopped at a market, and Steele, Wallace, and Herron went in without Irvin. They got back in the car. Steele dropped off Wallace at the Fay Apartments, and then took Irvin and Herron to Raven's house. Raven eventually took Irvin home.

5

{¶18} Raven testified that she had lent her car to Steele the day of the murder. She said Steele and Herron returned later that night. At trial, she denied knowing Irvin and that Irvin had returned in the car with Steele and Herron. She later admitted that she had told a police detective that Irvin had been with them. The following day, Raven bought a white Samsung phone from Herron. The phone was "empty," meaning it had no pictures, videos, or anything else on it and no SIM card. She put her own SIM card in the phone, and began using it. She stated that she did not know that the phone had belonged to Peek. A few days after the murder, her car was vandalized. She reported the car stolen, but later admitted to police she had lied. Amison later admitted to police that he and his friends had retaliated for the shooting by assaulting Herron and damaging Raven's car.

### D. The Investigation

{¶19} Detective Bill Hilbert responded to the murder scene. He spoke with witnesses and obtained descriptions of three suspects, who were later identified as Steele, Herron and Wallace. Police also obtained video surveillance tapes from Henry's Market that showed Wallace walk into the store at about 6:53 p.m. and walk out about 6:55. Similar surveillance videos taken at a residence on Neave Street also showed Wallace going in and out of Henry's Market, as well as shots being fired at 7:12 p.m.

{¶20} Detective Hilbert explained that the police had access to a license-plate-reader system called BOSS. There are cameras on police vehicles, as well as fixed camera locations that constantly take photographs of the license plates of cars that drive by the cameras. Detective Hilbert entered the license plate of the gold Hyundai Sonata into the database. He found photographs showing the car leaving

6

the Fay Apartments at about 6:14 p.m. and returning at 7:46 p.m. Police recovered the car and impounded it.

{¶21} Eventually, police obtained a search warrant for Peek's and Steele's cell phone records. Texts from Steele's phone showed that he was arguing with a woman about money, and that he texted others trying to obtain money. The day before the murder, he texted numerous people with the word "Firepup," which indicated that he had heroin for sale. He got no response.

{¶22} At 1:15 p.m. the day of the murder, he texted, "Tryn to figure something out keith down there." At 4:59, he texted, "Kan i get some money." He asked if "Keith" or "Sonny" was "down there." When he got the response, "Not yet," he replied, "let me know when of kome they getn struck today." The texts further showed that Steele arranged to use Raven's car, and that at 6:33 p.m., she texted that she would be ready in "[l]ike thirty minutes." Two hours after the murder, Steele was again texting with the angry female and stated, "I didn't lie I was trying to get some money."

{¶23} Peek's cell phone records showed that he last used his phone at 7:07 p.m. Someone had asked him what he was doing, he responded, "nun Chilling." Police were dispatched at 7:12 p.m., after getting 911 calls reporting the shooting. The following morning, Raven Herron began using Peek's phone.

{¶24} Police arrested Wallace at the home of his girlfriend, who gave consent to search. They recovered a 9 mm Hi-Point handgun, an antique rifle, and various ammunition. They also found a Chicago Bulls hat that witnesses said, and surveillance videos showed, that he was wearing the night of the murder.

{¶25} Detective Hilbert interviewed Wallace. Wallace told the detective that Steele had picked him up and that Steele was the only person he knew in the car.

After initially minimizing his role in events, he admitted that he was part of a plan to rob Peek. He said that he had initially contacted Steele about buying some marijuana, but that Steele had told him that "he knows a guy that we can get some money from, rob."

{¶26} Wallace further stated that he had a .380 gun that he sometimes held under a rag. He sat in the back seat with Herron, who definitely knew that they were going to rob someone. Steele parked the car near a school, and Herron got out of the car to "see if the dude was there." Herron called Steele, who had borrowed Wallace's cell phone, to report on the location of the intended victim.

{¶27} Wallace said that he got out of the car and walked towards Henry's Market where he intended to buy a cigar and juice. He bought a cigar, but realized after he walked out that he had forgotten to buy juice. As he walked back toward the store, he saw Peek, who made eye contact with him and started walking toward him. Then, Wallace stated, Peek pulled out a gun and started shooting. After initially claiming that Herron had shot at Peek, Wallace admitted that he fired a single shot back.

{¶28} Wallace said that he then ran from the scene and later threw his gun in the Ohio River. He continued walking until he got to a McDonald's, where Steele and Herron just happened "to pull back up on me." Steele drove him to the Fay Apartments and dropped him off.

### E. Wallace's Defense

{¶29} Wallace presented the testimony of Robert C. Maher, Ph.D., an audio forensic expert who studied the sound of the gunshots in the surveillance videos. He testified that a total of seven shots were fired. The first two shots sounded different and had different "reflection characteristics." Therefore, they were either fired from

8

two different firearms, or one firearm that changed location or orientation. Maher also testified that he had originally concluded that the remaining five shots were fired from the same gun, one that was different from the first gun or guns that fired the first and second shots. Upon further study of the videos, he later determined that the gun that fired the second shot also fired the remaining five shots.

{¶30} Wallace testified in his own defense. He said that he had contacted Steele and asked him where they could buy some marijuana. Steele picked him up. When the car arrived, there were three men in the car, but he only knew Steele. He testified that he had a gut feeling "something wasn't right," so he went back into the house and grabbed a gun for protection.

{¶31} Wallace had been arguing with his girlfriend that day. Most of the time that he was in the car, he was on the phone arguing with her. Wallace denied saying that he needed money or that he had his gun out in the car. He said that he heard no talk of a robbery.

{¶32} Steele parked the car, and they waited for a few minutes for Steele's "guy" who sold marijuana. Wallace became frustrated with the wait and went to Henry's Market. On the way, he spoke to Williams about playing basketball. After he left the market, he saw Herron and some other men standing on the corner. One of the men, whom Wallace later learned was Peek, walked toward him and made eye contact.

{¶33} Wallace testified that Peek looked angry, and his face was distorted. Wallace kept his face expressionless and continued to walk. He said Peek seemed to look beyond him toward Steele and the others on the corner. Wallace turned to look at the others. When he returned his gaze to Peek, Peek "flipped his shirt up, drew his gun out, and pointed it." Wallace also drew his weapon. Peek fired first, and Wallace

9

fired in response. Wallace denied aiming at or attempting to harm Peek. He said that he was merely trying to scare Peek and let Peek know that he was armed, too.

{¶34} Wallace said that Peek's bullet grazed the back of his neck, but it healed with no visible marks. After hearing more gunshots, Wallace walked to a McDonald's restaurant, where Steele picked him up and took him home.

## II. Certification of Nondisclosure

{¶35} In his first assignment of error, Wallace contends that the trial court erred in overruling his motion to strike the state's certification for nondisclosure of witnesses under Crim.R. 16. He argues that the that the certification did not contain any specific grounds on which the state was relying, but only general assertions that that witnesses have been threatened, harassed, or murdered. This assignment of error is not well taken.

{¶36} We review issues relating to discovery under an abuse-of-discretion standard. *See State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983); *State v. Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, ¶ 14. Crim.R. 16(I) requires each party to "provide to opposing counsel a written witness list, including names and addresses of any witnesses it intends to call[.]"

{¶37} But, under Crim.R. 16(D)(1), if "[t]he prosecuting attorney has reasonable, articulable grounds to believe that the disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion," the prosecuting attorney shall certify to the court that he or she is not disclosing discoverable materials. *Williams* at ¶ 15. Reasonable, articulable grounds may include, but are not limited to, "the nature of the case, the specific course of conduct of one or more parties, threats or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, whether

10

the defendant is pro se, and any other relevant information." Crim.R. 16(D). Generalized assertions are insufficient to meet the requirements of Crim.R. 16(D). *Williams* at ¶ 17. The trial court may not reject the prosecuting attorney's certification for nondisclosure unless it finds that the prosecution has abused its discretion. *State v. Woods*, 1st Dist. Hamilton Nos. C-130413 and C-130414, 2014-Ohio-3892, ¶ 34.

{¶38} On September 24, 2014, the state filed the certification, which provided that it sought "non-disclosure of the name and address of certain civilian witness[es] * * *. The disclosure of such information will compromise the safety of these witnesses and subject these people to intimidation or coercion." The certification contained mostly general assertions about other murder cases. But, it also stated,

> In the current case, the victim, Markeith Peek, was murdered in front of eyewitnesses. There are also additional civilian witnesses the State intends to call to piece together the chain of events and the aftermath of the crimes. The State seeks protection for these witnesses in the form of nondisclosure. The defendants are well known robbery boys in the neighborhood and beyond. They are also known to be violent. Citizens are afraid of these individuals and their extended network. In fact, many of the witnesses are afraid as well.

{¶39} Subsequently, Wallace filed a motion to strike the certification of nondisclosure on the basis that it was a "cookie cutter" pleading that did not contain case-specific facts. The trial court overruled the motion and set a date for a hearing under Crim.R. 16(F), which provides that "[u]pon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure * * * for abuse

11

of discretion during an *in camera* hearing conducted seven days prior to trial, with counsel participating."

{¶40} This court has stated that while generalized assertions in the prosecutor's certification are insufficient to meet the requirements of Crim.R. 16(D), that defect could be cured during the hearing provided for in Crim.R. 16(F). *Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, at ¶ 18. Nevertheless, we have concerns about the lack of specificity in the certification and whether that defect was cured at the hearing. The staff notes to Crim.R. 16 state that "the certification need not disclose the contents or means of a non-disclosed material, but must describe it with sufficient particularity to identify it in judicial review as described in Division (F)."

{¶41} But we need not reach that issue in this case. On February 2, 2015, a hearing on the certification was held before a different trial judge, seven days before the first scheduled trial date. The court held that the prosecution had not abused its discretion and that it would not require the state to disclose the witnesses' names. The state timely disclosed the names of the witnesses before the first trial date as required by Crim.R. 16(F)(5). But the trial did not go forward on that date. The case was continued for reasons unrelated to the certification, and the trial did not start until June 7, 2016, 16 months later.

{¶42} Consequently, Wallace knew the names of the witnesses for a substantial amount of time before the trial. He did not claim he could not go forward at that time, and he has not demonstrated any prejudice on the basis that the witnesses' names were not immediately disclosed. Therefore, any error was harmless beyond a reasonable doubt. *See State v. Bayless*, 48 Ohio St.2d 73, 357

N.E.2d 1035 (1976), paragraph seven of the syllabus; *State v. Bell*, 2015-Ohio-1711, 34 N.E.3d 405, ¶ 35 (1st Dist.). We overrule Wallace's first assignment of error.

### III. Hearsay

{¶43} In his second assignment of error Wallace contends that the trial court erred by admitting hearsay into evidence. He argues that the court should not have allowed testimony regarding a statement by an alleged coconspirator to be introduced without requiring the state to first present independent proof of the conspiracy. This assignment of error is not well taken.

{¶44} Evid.R. 801(D)(2)(e) provides that "A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." The statements of a coconspirator are not admissible until the proponent has made a prima facie showing of the existence of a conspiracy by independent proof. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 102. This rule merely requires that the state present sufficient evidence to raise the inference of a conspiracy. *State v. Johnson*, 2015-Ohio-3248, 40 N.E.3d 628, ¶ 104 (10th Dist.).

{¶45} This court has held that the court's premature admission of evidence under Evid.R. 801(D)(2)(e) can be harmless if independent prima facie proof of the conspiracy is produced before the case is presented to the jury. *State v. Jones*, 1st Dist. Hamilton No. C-090137, 2010-Ohio-4116, ¶ 21. Further, courts are authorized to make rulings that admit evidence that is "conditionally relevant," that is, evidence that is relevant only if other evidence subsequently presented demonstrates facts necessary to establish the relevance of the previously admitted evidence. *State v. Adkins*, 136 Ohio App.3d 765, 773, 737 N.E.2d 1021 (3d Dist.2000).

{¶46}  Wallace initially raised the issue during Amison's testimony when the state elicited statements by Steele during the phone call that Amison had overheard. The trial court allowed the testimony conditionally upon a proffer from the state.

{¶47}  The state informed the court that it had grave concerns that Amison might not appear in court the following Monday, so they had called him as a witness out of order.  The state told the court about Irwin, who would testify that he had been in the car with the three codefendants, that they had discussed that they needed money, and that they needed to "jug" someone, meaning to rob him.  The state also said that Raven would testify that she had received the victim's phone from her brother after the robbery and that she had loaned her car to Steele the night of the robbery.  The court warned the state that the testimony would be struck if no independent proof of the conspiracy was ultimately presented.

{¶48}  When the state called Irwin as a witness, it again addressed the issue. It asked to proffer Wallace's statement to the police in which he admitted that he and his codefendants had planned to rob the victim. The statement was going to be admitted through the testimony of Detective Hilbert, who had interviewed Wallace after the shooting.  A defendant's own statements may establish the independent proof of the conspiracy.  *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 101; *State v. Duerr*, 8 Ohio App.3d 396, 402, 457 N.E.2d 834 (1st Dist.1982).

{¶49}  The trial court conditionally allowed Irvin's testimony, and the state later presented the evidence that it had proffered.  Consequently, any error by the trial court in allowing the conspirator's statements into evidence before the proof of the independent conspiracy was harmless.

**{¶50}** Wallace further argues that the admission of the hearsay statements violated his right to confront the witnesses against him. The United States Supreme Court has held that only testimonial statements implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *State v. Lukacs* 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 11 (1st Dist.).

**{¶51}** Evid.R. 801(D)(2)(e) specifically provides that statements made by a coconspirator are not hearsay. They are inherently nontestimonial because the purpose for making the statements is not for later use at trial. *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 116. *Accord State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶ 36; *State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 89. Further, the Supreme Court has specifically identified statements in furtherance of a conspiracy as examples of statements that are inherently nontestimonial. *Braun* at ¶ 116, citing *Crawford* at 56. Consequently, the admission of the statements did not violate the Confrontation Clause.

**{¶52}** Finally, Wallace argues that the trial court erred in admitting the records of Peek's texts because they were hearsay. The only one of Peek's texts that was of any significance was a text just before the time of the murder. Someone texted him and asked what he was doing, and he answered, "nun Chilling." This text was admissible to rebut Wallace's claim that Peek was aggressive and looking to shoot someone the night of the murder. It was a statement of Peek's then existing state of mind and it was admissible into evidence under Evid.R. 803(3). *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 218-226; *State v. Sutorious*, 122 Ohio App.3d 1, 7-8, 701 N.E.2d 1 (1st Dist.1997).

{¶53} Other texts in which people called Peek by name were not admitted for their truth. Instead they were admitted to show that they were, in fact, sent to Peek. Since they were not admitted for the truth of the matter asserted, they were not hearsay under Evid.R. 801(C). *See State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980); *State v. Brewster*, 1st Dist. Hamilton Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 50.

{¶54} Wallace has not specified any other of Peek's texts that he claims were hearsay. The appellant bears the burden to show error by reference to the record. To be considered on appeal, errors by a trial court must be argued and supported by legal authority and citation to the record. App.R. 16(A); *State v. Brown*, 1st Dist. Hamilton No. C-120327, 2013-Ohio-2720, ¶ 24. In the absence of further specification, we decline to go through all of Peek's texts and decide whether each of them is hearsay. Consequently, we overrule Wallace's second assignment of error.

### IV. Other-Acts Evidence

{¶55} In his third assignment of error, Wallace contends that the trial court erred by admitting other-acts testimony. He argues that the court should not have allowed police officer Brandon Rock to testify about an encounter with Wallace about two weeks before the murder in which Wallace had a backpack containing marijuana, a bag of bullets and a cardboard case to a 9 mm firearm. This assignment of error is not well taken.

{¶56} Generally the prosecution in a criminal case may not present evidence that the defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that he acted in conformity with his bad character. Evid.R. 404(B); *State v. Wright*, 1st Dist. Hamilton No. C-150715, 2017-Ohio-1568, ¶ 43. But Evid.R. 404(B) also provides that other bad acts are

admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Shedrick*, 61 Ohio St.3d 331, 337, 574 N.E.2d 1065 (1991); *Wright* at ¶ 43.

{¶57} Because Evid.R. 404(B) codifies an exception to the general rule, it must be strictly construed against admissibility. *State v. Coleman*, 45 Ohio St.3d 298, 299, 544 N.E.2d 622 (1989); *Wright* at ¶ 44. Nevertheless, the other acts need not be similar to the crime at issue. If the acts tend to show by substantial proof any of the items enumerated in Evid.R. 404(B), evidence of other acts is admissible. *Coleman* at 299-300; *Wright* at ¶ 44.

{¶58} Officer Rock testified that on June 3, 2014, he heard a gunshot while on patrol. A short time later, he saw Steele, followed by Wallace, walking through a parking lot where drug sales often occurred. After Wallace placed his backpack on the ground, Officer Rock went to talk with him. Wallace permitted the officer to look through his backpack. He found a bag of bullets, an empty gun box, and two bags of marijuana. He seized those items, but he did not arrest Wallace, who he permitted to leave the area. Although the state contends that Wallace did not object to this testimony at trial, the record shows that he did.

{¶59} The state had the burden to show that Wallace purposely caused Peek's death while committing, attempting to commit or while fleeing after committing an aggravated robbery. *See* R.C. 2903.01(B) and 2903.02(B). To prove aggravated robbery, the state had to prove that Wallace possessed a firearm. *See* R.C. 2911.o1(A)(1). No guns were recovered at the scene and no bullet was found during Peek's autopsy. Of the three conspirators, Wallace was the only one alleged to have had a gun. Officer Rock's testimony was relevant to show that Wallace had

access to and the opportunity to use a firearm. Thus it shows knowledge, absence of mistake, preparation or plan, and intent.

{¶60} Under the circumstances, we cannot hold that the trial court abused its discretion by allowing the other acts to be admitted into evidence. *See State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018, ¶ 29. Consequently, we overrule Wallace's third assignment of error.

### V. State's Impeachment of its Own Witness

{¶61} In his fourth assignment of error, Wallace contends that the trial court erred by allowing the state to impeach its own witness. Under Evid.R. 607(A), the party calling a witness may attack the witness's credibility by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 27.

{¶62} Counsel may show surprise if the witness's trial testimony is materially inconsistent with the witness's prior statements and counsel had no reason to believe that the witness would recant when called to testify. *State v. Holmes*, 30 Ohio St.3d 20, 23, 506 N.E.2d 204 (1987); *Thomas* at ¶ 27. Surprise is a factual issue left to the trial court's discretion. *State v. Diehl*, 67 Ohio St.2d 389, 390-391, 423 N.E.2d 1112 (1981); *Thomas* at ¶ 27. Affirmative damage occurs when the witness testifies to facts that contradict, deny, or harm the party's trial position. *Thomas* at ¶ 27. A neutral answer such as "I don't remember" does not, in and of itself, constitute affirmative damage. *State v. Williams*, 1st Dist. Hamilton No. C-150249, 2016-Ohio-5827, ¶ 28.

{¶63} Wallace contends that the state was allowed to impeach Raven's testimony to the effect that she did not know Irvin and did not remember seeing him the night of the murder. She acknowledged that she had loaned her car to Steele, but

stated that she did not know if Irvin was with Steele and Herron when they returned the car. She also denied driving anyone home that night. These were not neutral answers. She was not saying she did not know the answer to a question or did not remember a certain fact. She specifically stated that she was certain she did not know Irvin at all, which was inconsistent with her statement to Detective Hilbert shortly after the murder. Consequently, the state made a showing of affirmative damage.

{¶64} Wallace failed to object to the state impeaching Raven Herron with her prior inconsistent statement. He has not demonstrated that the trial court abused its discretion in allowing the state to impeach its own witness, much less that any error rose to the level of plain error. *See Wright*, 1st Dist. Hamilton No. C-150715, 2017-Ohio-1568, at ¶ 49; *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 31. Consequently, we overrule Wallace's fourth assignment of error.

### VI. Prosecutorial Misconduct

{¶65} In his fifth assignment of error, Wallace contends that the trial court erred by permitting the prosecutor to make improper remarks and introduce improper evidence. Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162, 694 N.E.2d 932 (1998); *Wright* at ¶ 52. The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *Wright* at ¶ 52. The conduct of the prosecuting attorney cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Wright* at ¶ 52.

19

{¶66} Many of Wallace's arguments are a rehash of arguments we have already rejected in his previous assignments of error. Additionally, he failed to object to many of the comments he now claims were improper. Thus, he cannot raise those issues on appeal unless they rise to the level of plain error. *See State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983); *Wright* at ¶ 53. None of the comments that Wallace complains about was so egregious as to affect his substantial rights or to deny him a fair trial. Therefore, they did not rise to the level of plain error. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *Wright* at ¶ 53. Consequently, we overrule Wallace's fifth assignment of error.

### *VII. Weight and Sufficiency*

{¶67} In his sixth assignment of error, Wallace contends that the evidence was insufficient to support his conviction. Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution could have found that the state proved beyond a reasonable doubt all of the elements of murder under R.C. 2903.02(B), along with the accompanying specification. Therefore the evidence was sufficient to support the conviction. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29.

{¶68} Though the evidence in this case was complicated, it showed that Wallace acted in complicity with Herron and Steele to rob Peek, and that during the robbery, Wallace shot Peek. Wallace is primarily arguing that the state's witnesses were not credible. But in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 45.

{¶69} Wallace also contends that his conviction was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Blair*, 1st Dist. Hamilton Nos. C-100150 and C-100151, 2010-Ohio-6310, ¶ 24.

{¶70} Again, Wallace argues that the state's evidence was not credible, but matters as to the credibility of evidence are for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Thomas* at ¶ 48. Therefore, we overrule Wallace's sixth assignment of error.

### *VIII. Summary*

{¶71} In sum, we find no merit in Wallace's six assignments of error. The trial court committed no reversible error, and Wallace received a fair trial. We overrule his assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** concurs.
**MILLER, J.,** concurs in judgment only.

Please note:
   The court has recorded its own entry this date.